FILED
United States Court of Appeals
Tenth Circuit

June 24, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STEVE CERNO,

Defendant-Appellant.

No. 07-2136

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-05-1603 LH)

---

Alonzo J. Padilla, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for the Defendant–Appellant.

David N. Williams, Assistant U.S. Attorney, Office of the United States Attorney, Albuquerque, New Mexico, for the Plaintiff–Appellee.

---

Before **LUCERO**, **HOLLOWAY**, and **MCCONNELL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Steve Cerno appeals his jury conviction on five counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a) and his resulting sentence of life imprisonment. As to his conviction, Cerno challenges the admission of certain

impeachment evidence introduced during his cross-examination, arguing that the impeachment was inadmissable under Federal Rules of Evidence 403 and 404(b). With respect to his sentence, he maintains that the district court erroneously applied a United States Sentencing Guidelines ("Guidelines") enhancement and failed to appropriately consider several factors militating against a life sentence.

We conclude that the district court did not abuse its discretion in admitting the challenged evidence under Rule 403, and that the evidence was admitted for a proper purpose under Rule 404(b). Upon review of Cerno's sentence, however, we hold that the district court committed procedural error by refusing to consider the relative amount of force that Cerno used in committing the charged offenses. Such a consideration goes to the heart of 18 U.S.C. § 3553(a)'s mandate that a sentencing court consider the nature and circumstances of the offense conduct when fashioning an appropriate, individualized sentence. This error was not harmless and requires reversal. We therefore affirm Cerno's conviction, but reverse his sentence and remand to the district court with instructions to vacate and resentence.

**I**

**A**

On July 27, 2005, a federal grand jury indicted Cerno, an enrolled member of the Acoma Pueblo Indian Tribe, on five counts of aggravated sexual abuse in

Indian Country, in violation of 18 U.S.C. §§ 2241(a) and 2246(2)(B), and two counts of aggravated sexual contact in Indian Country, in violation of §§ 2244(a)(1) and 2246(3). The aggravated sexual abuse counts charged Cerno with using force on three occasions to orally and digitally violate his 16-year-old niece ("victim"). Two counts of aggravated sexual contact alleged that Cerno used force to cause the victim to touch his penis and to bite her breast. Cerno pleaded not guilty to all seven counts.

In a pretrial motion in limine, Cerno asked the court to prevent the government from introducing certain evidence at trial. First, he sought to exclude four pornographic videotapes that police found in the closet of his bedroom. Second, he asked the court to bar testimony relating to an incident in which, upon returning home from a tribal wake, the victim and other family members found him passed out on a couch with his penis exposed as a pornographic videotape played on the television ("exposure incident"). Cerno argued that both the videotapes and any testimony about the exposure incident were inadmissible under Federal Rules of Evidence 401 and 403 because the relevance of this evidence, if any, was substantially outweighed by the danger of unfair prejudice. The government responded that the evidence was relevant because it explained why the victim thought Cerno was "disgusting" and thus tended to support her claim that she did not consent to his physical advances on her. Relying on Rule

403, the court concluded that the evidence was inflammatory and had limited probative value, and thus granted Cerno's motion in limine.

At trial, the prosecution introduced the testimony of four witnesses, including the victim, her father and stepmother, and the investigating agent from the Federal Bureau of Investigation ("FBI"). The victim's father and stepmother testified generally about how they became aware of the victim's allegations, and discussed how the victim moved in with them on the reservation when she was 14, following the death of her mother. They stated that once the family determined that the living situation with the victim was not working out, the victim's grandmother volunteered to allow the victim to stay in her home, which was located on a separate part of the reservation. Cerno also lived with the victim's grandmother, his mother, at that time. The victim's father and stepmother stated that they never witnessed signs of abuse and became aware of the allegations only after the victim reported certain instances of abuse to other family members.

An FBI agent testified about her investigation into the abuse allegations. With respect to the charge that Cerno bit the victim's breast, the agent presented a photograph of a scar on the breast, but she conceded that the Bureau had not conducted a forensic comparison between the bite mark and Cerno's teeth.[1]

---

[1] When asked on cross-examination whether he inflicted the bite wound on the victim's breast, Cerno apparently demonstrated to the jury that he was missing
(continued...)

Only the victim specifically testified about the abuse. When she arrived at her grandmother's house in July 2004, Cerno vacated his bedroom to allow the victim to use it. It was in that bedroom that the abuse occurred. With respect to the charges of aggravated sexual abuse, she told the jury about several specific occasions during which Cerno had abused her by digitally and orally violating her. She also asserted that Cerno had once bit her breast and coerced her into touching his penis. Although she testified that Cerno did not physically threaten her or otherwise hit her, she stated that he forced her legs open when he assaulted her and that she tried to move away and close her legs to prevent the abuse. She also told the jury that she eventually reported the sexual abuse to two other relatives while she was visiting them in their home. On making these allegations against Cerno, she moved in with these relatives.

During cross-examination, Cerno's counsel asked the victim whether she was scared that Cerno might hurt her. The government objected, asking the court to reconsider its evidentiary ruling with respect to the exposure incident and the pornographic videotapes. It argued that the evidence would demonstrate that the victim feared Cerno because she had seen him asleep with his penis exposed, and because "pornography is a form of violence."[2] Although the court admonished

_____

[1](...continued)
several of his teeth.

[2] There is no evidence in the record that the videotapes, including the one
(continued...)

Cerno's counsel that he was "getting pretty close to the edge" with his questions, the court declined to reconsider its pretrial ruling.

The defense then proceeded with its only witness: Cerno himself. During direct examination, he admitted to being an alcoholic and to drinking six to eight beers a day during the period when the victim lived with him and his mother. He stated that he did not have any blackouts when he drank because he "would remember where [he] was at and what [he] had done" when he woke up from drinking. He conceded, however, that he occasionally passed out from drinking. Cerno further testified that he was not permitted to drink inside his mother's home, and that he would instead "just sit outside [in the family truck] and drink beer and listen to the radio and wait until somebody flickered the lights at [him], telling [him] it's time to go in and go to bed."[3] According to Cerno, drinking put him "in a lazy mood," and all he wanted to do was "sit down and just [be left] alone." "If [he] passed out, well, [he] passed out."

Cerno also denied committing the alleged abuse, claiming that the victim had perjured her testimony. In explaining why the victim might have falsely accused him, he theorized that she wanted to escape the restrictions of her

[2](...continued)
playing on the television on the night of the exposure incident, depicted anything other than consensual sex acts between adults.

[3] Cerno did state that, on occasion, he would sneak into his mother's house with alcohol and watch television while drinking.

grandmother's home and move in with more permissive relatives, and that the alleged abuse gave her an excuse to do so. He emphasized that the victim did in fact move in with those relatives shortly after she reported the abuse. He also posited that, as an alcoholic, he was an easy target for the allegations because he was essentially a "nobody." Finally, he questioned whether he could have had the opportunity to commit the abuse, noting that someone else was "usually always" in the house when he and the victim were at home, including his mother or one of his other nieces.

After Cerno's direct testimony, the government renewed its motion to admit the excluded evidence. It argued that the evidence contradicted Cerno's assertion that the victim contrived the allegations of abuse against him because he was "a drunk" and therefore a plausible scapegoat. The court initially denied the government's motion, but then ordered the parties to return to the bench, asking the government to clarify its argument. In asserting that the evidence was relevant, the government again claimed it was material to the element of force and that Cerno had made the testimony probative of that element during his cross-examination of the victim when he questioned her about her fear of Cerno. Because evidence of the exposure incident provided a basis for the victim's belief that Cerno was "repulsive, disgusting, [and] disgraceful," the government also claimed it was relevant to the victim's allegations that she attempted to prevent him from violating her. Although the court then asked the government whether

the evidence might have some value to impeach Cerno's direct testimony, it ultimately reaffirmed its earlier decision to exclude the disputed evidence.

On cross-examination, Cerno was asked whether his heavy drinking impaired his judgment. Cerno responded that it did not, stating that "[s]ix to eight cans all day long isn't going to impair my judgment to where I don't know what I'm doing." He later acknowledged, however, that his alcoholism had a negative impact on his family life and said that "if I'd kept on the way I was going, yes, it would have [impaired my judgment] eventually." He further admitted that although his drinking habit had not yet impaired his judgment, it was getting close to doing so.

At the completion of Cerno's cross-examination, the government again asked to approach the bench. Prior to hearing any argument from counsel for either side, the court stated that it now saw "significant" probative value in impeaching Cerno by questioning him about the exposure incident. It therefore granted the government's request, explaining that the government could inquire into the incident to impeach Cerno's statements that "he was completely in control of his senses" when he drank and that "he didn't lose his judgment" as a result of his drinking. According to the court, it was "clear" that Cerno lost his judgment on the night of the exposure incident and that questioning on the issue was therefore appropriate impeachment material.

The prosecutor then questioned Cerno about his recollection of the incident

and whether he thought his judgment was impaired on the night in question.[4]

Their exchange follows:

Q:    Mr. Cerno, you testified here that your drinking had reached
      the point where your judgment was almost becoming impaired,
      but had not yet become impaired, correct?
A:    Yes.
Q:    And you have also testified that you have never drank to the
      point where you passed out and didn't remember what you'd
      been doing.  Is that also correct?
A:    I passed out, but not black-outs.
Q:    Okay.  And you indicated that your senses of judgment were
      always not impaired?  Your senses of judgment weren't
      impaired by your drinking?
A:    My judgment was impaired sometimes, but physically.
Q:    Okay.  Do you recall a point in time between the time frame of
      July and August of 2004 and the 31st day of April of 2005,
      when you were at your mother's house and you had been
      drinking, and you passed out, with your penis exposed,
      watching a pornographic movie?
A:    Yes.
Q:    You would agree with me, wouldn't you, that at that point your
      judgment had become very much and terribly impaired?
A:    No.
Q:    That was not bad judgment?
A:    No one was at home, so I watched it and passed out.
Q:    With your penis exposed?
A:    Yes.  I didn't expect anybody home.  Everybody was not
      supposed to come home that night.
Q:    You've learned that they did in fact come home?
A:    Yes.
Q:    And you've learned that [the victim] and two other people
      came back from a wake and saw you passed out, with your
      penis exposed, watching a pornographic movie?

_____

[4] Cerno did not request a limiting instruction from the court regarding the
proper use of this testimony as impeachment evidence, and the court did not give
one.

A:    Yes.
Q:    And you would not agree with me?  You wouldn't agree that your judgment was impaired?
A:    No, because I was watching it.  I remember watching it.

In closing argument, the prosecutor highlighted Cerno's testimony with respect to the exposure incident, arguing that Cerno's judgment was "by definition" impaired.  He further urged that Cerno's testimony about the event demonstrated that he had been dishonest in stating that he could not have had an opportunity to abuse the victim because there was always someone around when both Cerno and the victim were at home.

The jury returned a verdict of guilty on the five counts of aggravated sexual abuse and not guilty on the two counts of sexual contact.  Cerno thereafter moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  Alternatively, he sought a new trial.  Cerno argued that the evidence did not support a finding of guilt, and he renewed his objection to the admission of testimony regarding the exposure incident.  He protested that the evidence substantially prejudiced his ability to receive a fair trial.  In response, the government argued that the testimony was properly admitted to impeach Cerno's testimony regarding his exercise of judgment while drinking.

In a memorandum opinion denying Cerno's motion, the court clarified its decision to allow the prosecutor to raise the exposure incident during the government's cross-examination of Cerno:

The testimony at issue impeaches Defendant's claims that drinking did not impair his judgment and that he knew what he was doing when he drank. The testimony also impeaches Defendant's statements that he would sit down and not do anything when drinking. The challenged testimony indicates that Defendant, when drinking, did engage in activities of a sexual nature, contrary to what his testimony represented. The Court therefore concluded that the Rule 403 balancing weighed in favor of admitting the evidence because the exposure testimony had significant probative impeachment value that was not outweighed by its potential for unfair prejudice.

**B**

The case then proceeded to sentencing. Cerno's Presentence Investigation Report ("PSR") recommended a base offense level of 30 for each of the five counts of conviction. See U.S.S.G. § 2A3.1(a). The PSR calculated a total offense level of 46 after the following adjustments: (1) a four-level increase because the offense of conviction involved conduct proscribed by 18 U.S.C. § 2241(a), see U.S.S.G. § 2A3.1(b)(1); (2) a two-level increase because the victim was in the custody, care, or supervisory control of the defendant when the abuse occurred, see § 2A3.1(b)(3)(A); (3) a five-level increase under the multiple-count adjustment, see § 3D1.4; and (4) a five-level increase because the offense involved a pattern of sexual abuse against a minor, see § 4B1.5(b)(1). With Cerno's total offense level of 46 and criminal history category of I, the PSR recommended a Guidelines sentence of life imprisonment.

Cerno filed a number of objections to the PSR's sentencing recommendations. Relevant to this appeal, he contended that application of the

five-level enhancement under § 4B1.5(b)(1) was in error because the offense of conviction was not a "covered sex crime" within the meaning of that guideline as the victim was over 16 years of age at the time of the abuse. He also asked the court to grant a variance from the recommended range because a lesser sentence would satisfy the sentencing goals of 18 U.S.C. § 3553(a). Cerno urged the court to consider a number of mitigating factors, including that the evidence presented at trial showed that he had used only minimal force against the victim.

At sentencing, the district court rejected each of Cerno's arguments and adopted the recommendations of the PSR. As to the § 4B1.5(b)(1) enhancement, the court concluded that the Guidelines commentary defined a minor as anyone under the age of 18 and that the enhancement was therefore properly applied. Addressing the propriety of a variance from the Guidelines, the court declined to consider the amount of force used to commit the crime. The court explained that, as a matter of law, it was "not permitted to use a comparative analysis to say, well, this is not as great a force as many other sex abuse cases include." It then concluded that the other proffered mitigators did not merit a lower sentence, stating: "I struggled to find something that is mitigating that I could use to reduce the sentencing level. I didn't find anything that would justify a reduction in the term." The court imposed a sentence of life imprisonment, and this timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

**II**

-12-

We begin by considering Cerno's evidentiary challenge, based on Federal Rules of Evidence 403 and 404(b). Cerno contends that his conviction must be reversed because the district court improperly allowed the prosecutor to question him regarding the exposure incident. Invoking Rule 403, he argues that the prosecutor's questioning did not impeach his trial testimony and therefore lacked probative value. The defendant also claims that even if the testimony were relevant, any probative value was substantially outweighed by the risk of unfair prejudice. Finally, he argues that the admission of the evidence violated Rule 404(b) because it allowed the jury to consider improper character evidence.

**A**

Relevant evidence is generally admissible. Fed. R. Evid. 402. Under Rule 403, however, a district court may exclude relevant evidence if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. In determining whether evidence is properly admitted under Rule 403, we consider (1) whether the evidence was relevant, (2) whether it had the potential to unfairly prejudice the defendant, and (3) whether its probative value was substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 401 & 403.

At trial, the district court concluded that the exposure incident was relevant to Cerno's credibility because it impeached several of his earlier statements, including that drinking did not impair his judgment. Although this is a close

question and we may well have come to a different conclusion ourselves, our own view of the issue is not relevant under the applicable standard of review. Instead, we must ask whether the district court abused its discretion under Rule 403 in allowing the impeachment, United States v. Espinoza, 244 F.3d 1234, 1239 (10th Cir. 2001), and we cannot say that it did so.

**1**

We first address the issue of relevancy. The district court ruled that the exposure incident had some relevance because it impeached Cerno's testimony regarding the effect that drinking had on his judgment. In its order denying a new trial, it also concluded that the evidence impeached Cerno's assertions that he knew what he was doing when he drank and that he would sit and not do anything when drinking. Because a court need only identify one legitimate basis for its ruling, we begin—and end—our analysis with the first justification cited by the district court. See United States v. Abel, 469 U.S. 45, 56 (1984) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case.").

Cerno admitted on direct that he was an alcoholic, and testified that he probably drank between six and eight beers a day. On cross-examination, he denied that his drinking habit significantly affected his judgment. He later conceded that his drinking problem had a negative impact on his family life, and

-14-

that it likely would have impaired his judgment if he continued down the same road. He also admitted that his alcoholism was getting close to impairing his judgment. It was after this final statement that the district court allowed the prosecutor to ask questions regarding the exposure incident.

Against this factual background, we assess whether the incident tended to impeach Cerno's earlier testimony. Generally speaking, impeachment is the discrediting of a witness' veracity, such "as by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense." Black's Law Dictionary 768 (8th ed. 2004) (defining impeachment). Impeachment can be accomplished in a number of ways, including contradiction, which occurs when an opposing party endeavors to show that a fact to which the witness has testified is not true. See United States v. Crockett, 435 F.3d 1305, 1313 (10th Cir. 2006). Undoubtedly, the contested evidence was relevant if the exposure incident tended to show that Cerno was not truthful when he stated that drinking did not impair his judgment. See United States v. Kozinski, 16 F.3d 795, 805 (7th Cir. 1994) ("Impeachment by contradiction is a valid method of impeachment and simply involves presenting evidence that part or all of a witness' testimony is incorrect." (quotation omitted)).

As we view the matter, the evidence was relevant to Cerno's veracity. The jury could have inferred from the testimony that Cerno's behavior during the incident showed poor judgment because he had allowed himself to fall asleep in a

common area of the house while in a compromised state. Although it was undisputed that Cerno believed that his family would be gone for the entire night, his failure to consider that they might return early could show that Cerno's judgment was indeed impaired by his drinking. Such a conclusion tends to indirectly undermine his testimony that his alcoholism had not yet reached the point where it affected his judgment. See United States v. Racstraw, 7 F.3d 1476, 1481 (10th Cir. 1993) ("The defendant who testifies has chosen to make an issue of his credibility . . . . The government, accordingly, has a right to challenge the defendant's story on cross-examination [and] . . . may impeach the defendant by developing inconsistencies in his testimony."); United States v. Lara, 956 F.2d 994, 996-97 (10th Cir. 1992) (affirming admission of impeachment testimony where it was necessary to refute the misleading picture that the witness painted to the jury); see also Fed. R. Evid. 611(a)-(b). Mitigating the relevance of the incident is the fact that Cerno was careful to explain that his drinking had some effect on his behavior, as it disrupted his family life and led him to pass out, even while generally insisting that it did not affect his judgment. Thus, although we agree with the district court that the evidence had some relevance as impeachment by contradiction, we cannot go so far as to agree that it had "significant"

impeachment value or directly "fl[ew] in the face" of Cerno's previous statements, as the district court concluded.[5]

**2**

We also consider whether the testimony was likely to unfairly prejudice Cerno. We have no doubt that it had such a potential.

"Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment

_____

[5] According to the dissent, any impeachment by reference to the exposure incident "was not relevant *at all* . . . [b]ecause the testimony had no probative value . . . ." Dissent at 1-2. But the threshold for relevance under the Federal Rules of Evidence is not a high one. A party need only show that the proffered evidence has "<u>any tendency</u> to make the existence of <u>any fact</u> that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). Included among those facts of consequence at trial is the credibility of testifying witnesses. We therefore consider it clear that the prosecutor's impeachment of Cerno by reference to the exposure incident had at least some relevance because, as we have already explained, the jury could have inferred from the offered testimony that Cerno was not fully forthcoming when he testified that drinking did not impair his judgment.

The dissent's more fundamental concern is that because the exposure incident did not <u>directly</u> contradict any of Cerno's careful statements, it was impermissible to use the incident as impeachment evidence. Often, impeachment by contradiction is a matter of contrasting black with white. <u>See, e.g.</u>, <u>Lara</u>, 956 F.2d at 995-97 (upholding district court's decision to allow impeachment by contradiction where the defendant testified that he had never "been prosecuted for anything" but knew that he was currently under prosecution for a separate crime). Yet, not every case involves clear-cut testimony for the court to parse in determining whether disputed impeachment should be pursued. At a minimum, the potential for contradiction was sufficient as to the question of Cerno's impaired judgment that the district court did not err in determining that the evidence was relevant.

as to his guilt or innocence of the crime charged." United States v. Leonard, 439 F.3d 648, 652 (10th Cir. 2006) (quotation omitted); see also Fed. R. Evid. 403 advisory committee's note (defining unfairly prejudicial evidence as that having "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). Prior to trial, the district court found that the exposure incident would be prejudicial because "it could divert the jury's attention away from the question of [Cerno's] responsibility for the crimes charged to the improper question of [Cerno's] bad character." We agree.

By allowing the jury to hear details about the incident, the court created a risk that the jury's decision would be improperly affected by emotional disdain for Cerno's proclivity toward pornography and by the inference that Cerno engaged in unsavory sexual activity while drunk. Because the underlying charges involved a sex crime and the jury did not hear any other evidence regarding Cerno's sexual behavior, the jury may also have been tempted to rely on the exposure incident as evidence of Cerno's guilt for the crimes charged. Cf. United States v. McCarty, 82 F.3d 943, 950 (10th Cir. 1996) (holding that the trial court properly disallowed impeachment of a witness by questioning related to "serious and unsubstantiated allegations of sexual impropriety"); United States v. Devery, 935 F. Supp. 393, 408 (S.D.N.Y. 1996) ("Cross-examination concerning immoral acts and acts of sexual perversion may be properly excluded by a trial judge who determines they are not probative of the witness's veracity."); Fed. R. Evid.

-18-

611(a)(3) (providing trial court with discretion to "protect witnesses from . . . undue embarrassment"). In short, the evidence had the potential to affect the jury's attitude toward Cerno on an issue unrelated to his guilt, and thus was undoubtedly prejudicial. But this does not necessarily get the defendant over his evidentiary hurdle.

**3**

Our inquiry next requires us to consider whether the district court abused its discretion in concluding that the probative value of the impeachment testimony was not substantially outweighed by the risk of unfair prejudice. Under Rule 403's balancing test, it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must <u>substantially</u> outweigh the evidence's probative value. See <u>United States v. Tan</u>, 254 F.3d 1204, 1212 (10th Cir. 2001); <u>SEC v. Peters</u>, 978 F.2d 1162, 1171 (10th Cir. 1992). In engaging in the requisite balancing, we "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." <u>Deters v. Equifax Credit Info. Servs., Inc.</u>, 202 F.3d 1262, 1274 (10th Cir. 2000). Because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues, our review affords the district court "considerable discretion in performing the Rule 403 balancing test." <u>Tan</u>, 254 F.3d at 1211.

Under this deferential standard of review, we cannot say that the district court abused its discretion in allowing the government's line of questioning. In reaching this conclusion, we do not discount the unfair prejudice that Cerno might have suffered as a result of the introduction of this testimony.[6] We do not doubt, however, that the evidence was at least somewhat probative of Cerno's veracity. Whether the incident actually undermined Cerno's credibility by showing an exercise of impaired judgment was reasonably left for the jury to determine. The Rule 403 analysis we apply is not a wooden or mathematical one; we must allow the trial judge adequate discretion to make a proper determination of the question based on his or her presence during the trial. Thus, although ultimately a close call, we will not upset the court's decision to admit the disputed testimony on this record.

**B**

Cerno also challenges the district court's decision to allow the government to question him with respect to the exposure incident on the ground that the court allowed the jury to consider impermissible character evidence in violation of Rule 404(b). He specifically contends that "the district court admitted the evidence, under the guise of impeachment, to prove that Mr. Cerno engaged in sexual

---

[6] Cerno certainly could have reduced the potential prejudice by asking the court to issue an instruction limiting the testimony to its proper use as impeachment evidence. See, e.g., United States v. Lewis, 700 F.2d 1328, 1332 (10th Cir. 1983).

activities while drunk."  Because Cerno did not object to the introduction of the disputed evidence on this basis before the district court, we review his appellate challenge only for plain error.[7]  United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992); see also Fed. R. Evid. 103(a)(1) (requiring counsel to "stat[e] the specific ground of objection, if the specific ground was not apparent from the context").  We fail to discern any error under Rule 404(b).

Rule 404(b) prohibits the admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."  It allows, however, for the admission of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."  Rule 404(b) (emphasis added).  Included among the other proper purposes for the admission of prior act evidence is impeachment.  See, e.g., United States v. Olivo, 69 F.3d 1057, 1065 (10th Cir. 1995).  Huddleston v. United States, 485 U.S. 681 (1988), establishes that, when offered for a permissible purpose, prior act evidence is admissible so long as it is relevant, its probative value is not substantially

---

[7] Cerno creatively explains his failure to raise a Rule 404(b) objection prior to this appeal on the ground that it did not become apparent to him that the district court admitted the evidence in violation of Rule 404(b) until its order denying his motion for a new trial.  Our review of the record, however, reveals that a 404(b) objection would have been no less pertinent in Cerno's motion in limine, as an additional basis for his objections when the issue arose at trial, and in his motion for a new trial, than it is on appeal.  We therefore perceive no justification for not applying a plain error standard of review to the present contention.

outweighed by its danger for unfair prejudice, and the trial court, if requested, provides a limiting instruction to the jury on the proper use of the evidence. Id. at 691-92.

Because the district court unambiguously ruled at trial that the prosecutor could question Cerno about the exposure incident not to demonstrate Cerno's bad character, moral turpitude, or criminal disposition, but for the limited purpose of impeaching Cerno's credibility, the evidence was admissible for a proper purpose. It was also relevant and otherwise admissible under Rule 403. Although a limiting instruction may have helped reduce potential prejudice to Cerno, none was requested. Consequently, consistent with the test set forth in Huddleston, the district court did not run afoul of Rule 404(b) when it allowed the prosecutor to question Cerno on point.

### III

In the challenge to his life sentence, Cerno argues that the district court committed procedural error in calculating his sentence by erroneously applying a five-level sentencing enhancement, and by refusing to consider the comparative amount of force he used to commit the abuse. It is further contended that the sentence was substantively flawed because the court should have varied downward from the advisory Guidelines range based on various mitigating circumstances. We agree with Cerno that the district court committed procedural

-22-

error by refusing, as a matter of law, to entertain his argument that relatively little force was used to perpetrate the assaults. We reverse on this basis.

On appeal, we review sentences only to determine if they are reasonable. United States v. Kristl, 437 F.3d 1050, 1055 (10th Cir. 2006). This review first entails consideration of whether the district court committed any significant procedural error. See Gall v. United States, 128 S. Ct. 586, 597 (2007); United States v. Smart, 518 F.3d 800, 803 (10th Cir. 2008). Procedural error occurs when a district court, among other things, "fail[s] to calculate (or improperly calculat[es]) the Guidelines range, . . . [or] fail[s] to consider the § 3553(a) factors." Gall, 128 S. Ct. at 597 (2007). Only if the district court follows sound procedure may we then consider whether the resulting sentence is reasonable in substance. See United States v. Todd, 515 F.3d 1128, 1134-35 (10th Cir. 2008); Kristl, 437 F.3d at 1055.

## A

Cerno first challenges the procedural reasonableness of his sentence by urging that the district court inaccurately applied a sentencing guideline, U.S.S.G. § 4B1.5(b), which requires an increase of five offense levels if a defendant has perpetrated a "covered sex crime." Cerno contends that he did not commit a covered sex crime because his offense of conviction, 18 U.S.C. § 2241(a), was not perpetrated against a person under the age of 16. Our review of this purely legal question is de novo. See United States v. Martinez-Macias, 472 F.3d 1216,

1218 (10th Cir. 2006). Because we conclude that the guideline applies to all victims under the age of 18, Cerno's argument is unavailing.

The contested enhancement requires a sentencing court to add five levels to the defendant's adjusted offense level when the "offense of conviction is a covered sex crime . . . and the defendant engaged in a pattern of activity involving prohibited sexual conduct."[8] U.S.S.G. § 4B1.5(b). Cerno's challenge centers around the meaning of a "covered sex crime," which the § 4B1.5 application notes define as "(A) an offense, perpetrated against a <u>minor</u>, under (i) chapter 109A of title 18, United States Code . . . ." § 4B1.5, cmt. n.2 (emphasis added). Pertinent notes also define a "minor" as "an individual who had not . . . attained the age of 18 years . . . ." § 4B1.5, cmt. n.1.

Notwithstanding these seemingly straightforward definitions, Cerno asks us to look beyond the text of the guideline itself, pointing to certain crimes within Chapter 109A of title 18, which, as an element of those offenses, require that the victim be either below the age of 12 or below the age of 16. <u>See, e.g.</u>, 18 U.S.C. § 2241(c) (defining the statutory penalties for aggravated sexual assault of a child under 12 years old); § 2243 (defining "minor," for the purposes of that section, as one who "has attained the age of 12 years but has not attained the age of 16

---

[8] Although Cerno's opening brief disputed whether his offense conduct established a "pattern of activity" as required by the enhancement, his reply brief concedes "that there was enough evidence at trial to establish [such] a pattern." We therefore do not address the applicability of this aspect of the enhancement.

years"); § 2244(c) (defining "young children" as individuals less than 12 years old). But his argument ignores the critical fact that the enhancement itself provides a conclusive definition of "minor," and nothing in Application Note 2 instructs a court to reference Chapter 109A—or any other statute—to afford meaning to the term "<u>minor</u>" other than that provided in the explanatory note. Rather, the application note directs the court to Chapter 109A only to determine whether the offense of conviction is a "covered sex crime," and § 2241(a) plainly is. Moreover, if the Sentencing Commission did not intend the definition of "minor" included in the application note to apply to the guideline at issue, then that definition would be entirely surplusage, as "minor" is not used anywhere else in the disputed guideline. <u>See</u> U.S.S.G. § 4B1.5, cmt. n.1 ("<u>For purposes of this guideline</u>: 'Minor' means an individual . . . who had not attained the age of 18 years . . . ." (emphasis added)).

Relatedly, the Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." <u>Stinson v. United States</u>, 508 U.S. 36, 38 (1993); <u>see also</u> <u>United States v. Ruiz-Rodriguez</u>, 494 F.3d 1273, 1275 n.2 (10th Cir. 2007). Cerno does not argue that the commentary violates the constitution or a federal statute, but rather that it is a plainly erroneous reading of the guideline in light of the statutes cited within the application note to § 4B1.5. Given our conclusion

that the district court did not err in reading the guideline and its accompanying notes, the definition of "minor" found therein is authoritative and must be applied. Thus, because the victim was unquestionably 16 years old at the time of the abuse, she fell within the authoritative definition of the guideline, and the district court properly applied the five-level enhancement.

**B**

Cerno next contends that the district court erred by failing to consider, as a matter of law, the relative amount of force that he used to commit the sexual abuse. That the degree of force used to perpetrate the assaults was minimal when compared to other cases of aggravated sexual abuse, Cerno insists, compels the court's consideration of "the nature and circumstances of the offense" under 18 U.S.C. § 3553(a)(1) in favor of a potentially different sentence. We agree.

At Cerno's sentencing hearing, the district court explained its refusal to consider the nature of the force used to perpetrate the abuse as follows:

> [T]he court is not permitted to use a comparative analysis to say, well, this is not as great a force as many other sex abuse cases include. That's not the standard set forth in the law. I am prescribed [sic] to apply the law as it is written and not in a comparative sense.

We recognize that the court's statement correctly reflects what Cerno's statute of conviction, § 2241(a), requires for determining whether a defendant is guilty of aggravated sexual abuse. See, e.g., United States v. Weekley, 130 F.3d 747, 754 (6th Cir. 1997) ("[F]orce sufficient to sustain a conviction under 18 U.S.C.

§ 2241(a) includes the use of such physical force as is sufficient to overcome, restrain or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the victim." (quotation omitted)). In other words, whether the government has shown that the defendant's actions meet the legal definition of "force," a necessary element of the charged crime, is not a comparative question. But at sentencing, the minimal elements required to secure a conviction are not dispositive of the sentence a defendant should receive. Sentencing law simply does not foreclose a court's individual consideration of the specific nature and circumstances of the offense conduct at issue, including whether the offense committed was more or less heinous than offenses committed by other defendants convicted under the same statute. Indeed, the sentencing statute <u>mandates</u> that a court consider the "nature and circumstances of the offense" in fashioning a sentence "sufficient, but not greater than necessary" to accomplish the sentencing goals outlined in the sentencing statute. § 3553(a); <u>see also</u> <u>Kimbrough v. United States</u>, 128 S. Ct. 558, 570 (2007).

A sentencing court's failure to consider a relevant sentencing factor is a form of procedural sentencing error. <u>See</u> <u>Gall</u>, 128 S. Ct. at 597 (holding that a district court commits procedural error by "failing to consider the § 3553(a) factors"). The district court therefore procedurally erred by refusing to consider the potential merits of Cerno's argument in fashioning an individualized sentence. Although the district court committed error, resentencing is required only if the

-27-

error was not harmless; that is, if the error affected the court's selection of the sentence imposed. See Kristl, 437 F.3d at 1055; see Williams v. United States, 503 U.S. 193 (1992). Harmlessness must be proven by a preponderance of the evidence, and the burden of making this showing falls on the beneficiary of the error—in this case, the government. United States v. Conlan, 500 F.3d 1167, 1170 (10th Cir. 2007).

Harmlessness cannot be established on this record. At the sentencing hearing, the district court stated: "I struggled to find something that is mitigating that I could use to reduce the sentence level. I didn't find anything that would justify a reduction in the term." (emphasis added). It is apparent from this comment that the court was receptive to imposing a sentence of less than life imprisonment, assuming that it could find a proper justification in the law. Even though we express no opinion regarding the appropriateness of a life sentence for Cerno's crimes, the fact that he received the maximum permissible term of imprisonment clearly establishes that any error during sentencing was not harmless. To hold otherwise would impermissibly require us to enter a "zone of speculation and conjecture." United States v. Labastida-Segura, 396 F.3d 1140, 1143 (10th Cir. 2005).

In sum, because the district court committed procedural error by refusing to consider the relative amount of force Cerno used to commit the assaults, and because that error was not harmless, we reverse Cerno's sentence. Furthermore,

-28-

because Cerno must be sentenced anew, we do not reach his challenge to the substantive reasonableness of his present sentence. See Todd, 515 F.3d at 1135 (holding that when a district court commits procedural sentencing error, "we must remand for resentencing, whether or not the district court's chosen sentence is substantively reasonable, unless we are able to ascertain that the court's calculation error was harmless").

## IV

In light of the foregoing, we **AFFIRM** Cerno's conviction, but **REVERSE** his sentence, and **REMAND** to the district court with instructions to vacate the sentence and resentence the defendant.

No. 07-2136, *United States v. Cerno*
**MCCONNELL**, J., concurring in part and dissenting from Part II.

I agree with much of the majority's reasoning. I agree that the sentence must be remanded to allow the district judge to exercise the full range of his discretion, including consideration of the relative amount of force used in commission of the offense. I agree that allowing the prosecution to cross-examine Mr. Cerno about the embarrassing "exposure incident"[1] was "undoubtedly prejudicial." Maj. Op. 18–19. The district judge thought so too, which is why he excluded reference to the incident on a pre-trial motion in limine and on three subsequent occasions during trial. The judge never retracted or wavered in his prejudice finding, though he later changed his view of relevance in light of developments at trial. I also agree with the majority that the relevance (if any) of the exposure incident was less than the district court found: "we cannot go so far as to agree that it had 'significant' impeachment value or directly 'fl[ew] in the face of Cerno's previous statements, as the district court concluded." *Id.* at 16–17 (quoting from the district court).

I would go a step further. Based on a full reading of the trial transcript, and giving the prosecution and the district court every benefit of the doubt, I am forced to the conclusion that this evidence was not relevant *at all*. It was solely prejudicial, and in light of the weakness of the prosecution's case, it very likely

_____

[1]The incident is described at Maj. Op. 3. The delicacy with which all participants in this case speak of the incident highlights the prejudicial effect it must have had on the jury.

affected the outcome. I therefore do not reach the third step in the majority's analysis of the evidentiary issue, which is whether the district court abused its discretion under Rule 403 in balancing the probative value of the testimony against its undoubted prejudicial effect. Because the testimony had no probative value, there was nothing to balance.

The majority reaches its conclusion because of its commendable disinclination to second-guess the able trial judge on a matter particularly within his discretion, namely Rule 403 balancing. Maj. Op. 19–20. Given the highly contextual character of the exercise of weighing probative value against prejudice, appellate courts are properly reluctant to find an abuse of discretion at the balancing stage. *See United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (emphasizing the district court's "considerable discretion" with respect to Rule 403 balancing). I depart from the majority because I do not think this case gets to the point of balancing.

## I.  The Trial

This case was a classic example of he said-she said. The sole evidence against Mr. Cerno was testimony from the alleged victim, his 17-year old niece. She claimed that on at least three occasions over about one and a half months (at one point she claimed around 30 such incidents), when no one else was at home, Mr. Cerno penetrated her orally and digitally, on one occasion required her to touch his penis, and on one occasion bit her breast, leaving a scar. She admitted

-2-

he did not hit or physically threaten her, but testified that she resisted his advances and that he forced the contact.

Mr. Cerno took the stand and denied that he had ever engaged in any type of sexual contact with his niece, ever touched her in any inappropriate way, or ever used or threatened force against her. Tr. 341. He openly admitted to being a drunk, and testified that he spent most of his evenings outside, usually sitting in his mother's truck drinking beer and listening to the radio, sometimes in the corral or garden. He stated that after drinking he would sometimes "pass out," but that he did not have "black-outs," the distinction being that in the case of a black-out, he "can't remember anything" but when he merely "pass[ed] out" he would wake up the next day and "I would remember where I was at and what I had done." Tr. 323–24. When his mother was away from the house, he sometimes "sneaked" in and watched television while drinking, which his mother had forbidden in the house. Tr. 338. He testified that he had no opportunity to commit the charged acts because he was almost never alone in the house with his niece. His mother was usually at home, and when she went elsewhere, he generally drove her.

At trial, the defense attempted to show that the alleged victim had powerful motives to fabricate the charge: Until the age of 14 she lived with her mother in a permissive environment in Los Lunas, New Mexico. After her mother's death and an unsatisfactory placement with her father and stepmother, she was sent to live

with her grandmother in a remote section of the Acoma Pueblo reservation, far from her friends and subject to strict behavioral limitations, which she resented. As a result of her accusation that Mr. Cerno had abused her, she was sent to live with more congenial relatives closer to town. The theory of the defense was that she made up the abuse charges to accomplish this desired change.

There were other witnesses, but they provided no support for the prosecution's case. The victim's father and stepmother never saw any signs of abuse. There was no medical evidence. An FBI agent testified to her investigation into the matter, which, to put it charitably, was neither prompt nor thorough and uncovered nothing probative—with the possible exception of a photograph of the alleged victim's breast taken about a year after she claimed Mr. Cerno had bit it. As was brought out in cross-examination, the government did not conduct any forensic investigation to compare the bite marks to Mr. Cerno's teeth. Since Mr. Cerno is missing his four front teeth, this physical evidence was dubious proof of his guilt.

The prosecution showed great persistence in attempting to bring before the jury evidence of the unsavory exposure incident, putting forth a variety of theories of relevance, most of which the district court rejected. Before trial, in response to the defendant's motion in limine, the prosecutor argued that the incident was relevant because it explained why the alleged victim thought Mr. Cerno was "disgusting," and thus supported her claim that the incidents were

nonconsensual. The district court concluded that the incident had limited probative value and granted the motion in limine to exclude it. During trial, after the defense asked the alleged victim on cross-examination whether she had been scared that Mr. Cerno would hurt her, the prosecutor asked for reconsideration on the ground that testimony about the incident would show that the alleged victim had seen her uncle passed out in front of a pornographic video, and that "[p]ornography is a form of violence." Tr. 242. The district court declined to reconsider.

Again, after Mr. Cerno's direct testimony, the prosecutor renewed the motion, this time arguing that the exposure incident somehow showed that the defendant's claim that the alleged victim had fabricated the case against him was "artificial." Tr. 347. The district judge again denied the motion, stating that "there hasn't been established a nexus between the incident and the defendant's conduct, so far as I am aware." *Id.* at 350.

Before cross-examination could begin, however, the judge called the lawyers back to the bench to give the prosecutor another opportunity to explain how the exposure incident was related to the case. There ensued a lengthy discussion. Although the district court ultimately denied the prosecution's motion to allow the testimony, the discussion casts light on the reasons for its eventual admission. At first, the prosecutor argued again that the incident was relevant to showing lack of consent—which is odd, since by then it was clear that the

-5-

defendant's theory was not that the encounters were consensual but that they did not occur.

At that point, the judge for the first time introduced the possibility that the evidence might be relevant for impeachment purposes:

> THE COURT: Well, the reason I asked you to come back up here was that it occurred to me that he has professed being cognizant of everything, although he would pass out. And I doubt that. And this might be a way of contradicting or impeaching a witness, but I still have the concern that the impeachment is nexus [sic], is very limited or very, let's say, attenuated.

Tr. 352. The prosecutor, Mr. Spiers, leapt on that suggestion. Misstating the defendant's testimony,[2] the prosecutor argued: "the defendant has presented himself on direct as being, for lack of a better description, as being just a benign drunk . . . [a]nd that's not accurate." Tr. 352. The court asked:

> THE COURT: What are you going to do with this?
>
> MR. SPIERS: I want to ask him if there was an instance when he was passed out drunk, if there was something else going on; and in fact, he wasn't just passing out and drinking, and that there was something else, something a little bit more graphic and a little bit more disturbing.

Tr. 354. This suggests a possible reason for the prosecutor's persistence in trying to get this evidence in: that a jury might infer that a man who engages in such "graphic" and "disturbing" conduct as passing out in front of a pornographic

---

[2] The reasons this statement were misleading are outlined at page 11 below.

-6-

movie with his penis exposed is also someone who might sexually abuse his teenaged niece.

Defense counsel repeatedly challenged the relevance of the incident, and argued that even if it was relevant, any probative value was greatly outweighed by the prejudice. At the end of all this discussion, the court stated, without further explanation: "I'm not going to change my ruling. Please proceed." Tr. 357.

That was not the end of the matter. During the prosecutor's cross-examination of Mr. Cerno, the following colloquy took place:

> Q. Okay. Now, about drinking, you would agree it's kind of a problem in your life, isn't it?
>
> A: Yes.
>
> Q. And when you're drinking heavily, that impairs your judgment, doesn't it?
>
> A. Six to eight cans all day long isn't going to impair my judgment to where I don't know what I'm doing.
>
> Q. It never impaired your judgment to the point that you don't know what you are doing?
>
> A. Yes.
>
> Q. Is that your answer?
>
> A. Because that's almost drinking a beer every hour.

Tr. 362–63. At this point, the prosecutor asked to approach the bench again, to reopen the issue of introducing the exposure incident. After the court agreed to hear his argument, however, the prosecutor asked to reserve the issue until he

finished cross-examination, to which the judge also agreed.  After he completed his cross-examination, the prosecutor reminded the court of his request to "approach the bench one last time."  Tr. 376.  At this point, with no further prompting or argument, the judge announced:

> I've concluded that there is significant value in impeaching—probative value in impeaching the defendant by the incident that has been described in the motion in limine, excluding the discovery of videotapes in the closet, just the incident that she comes home and sees him passed out and the situation that you have described.  And it's impeachment only.

*Id*.

Defense counsel inquired "what exactly [the defendant] said that opens the door to that."  The judge answered: "Well, he said he was completely in control of his senses, he didn't lose his judgment.  That much is clear, that he lost it then."  *Id*.  The prosecutor chimed in that "[h]e also said that he has never drunk to the point where he passed out and didn't remember what he was doing," to which the judge responded: "Yes. That's pretty clear, in that he denies that his judgment was impaired, and I submit that that occasion flies in the face of his denial of losing judgment."  *Id*. at 377.  Defense counsel reminded the judge of the distinction Mr. Cerno had drawn between "passing out" and "blacking out," to which the judge responded: "You know, you can define 'passing out' any way you want to.  If he's unconscious, drunk, he is blacked out, passed out, whatever."  *Id*.

The prosecutor thus was free to ask Mr. Cerno about the exposure incident:

Q: Okay. Do you recall a point in time between the time frame of July and August of 2004 and the 31st day of April of 2005, when you were at your mother's house and you had been drinking, and you passed out, with your penis exposed, watching a pornographic movie?

A: Yes.

Q: You would agree with me, wouldn't you, that at that point your judgment had become very much and terribly impaired?

A: No.

Q: That was not bad judgment?

A: No one was at home, so I watched it and passed out.

Q: With your penis exposed?

A: Yes. I didn't expect anybody home. Everybody was not supposed to come home that night.

Q: You've learned that they did in fact come home?

A: Yes.

Q: And you've learned that [the victim] and two other people came back from a wake and saw you passed out, with your penis exposed, watching a pornographic movie?

A: Yes.

Q: And you would not agree with me? You wouldn't agree that your judgment was impaired?

A: No, because I was watching it. I remember watching it.

Tr. 381. The prosecutor later devoted about one page of his just-over-seven-page closing argument to the exposure incident.

In a strange split verdict, the jury convicted Mr. Cerno of the more serious charges of aggravated sexual abuse while acquitting him of the less serious charges of aggravated sexual contact. The defense moved for a judgment of acquittal or a new trial, partly on account of the admission of the prejudicial evidence. The district court denied the motion and entered a written order explaining the rationale for admission of the evidence:

> The testimony at issue impeaches Defendant's claims that drinking did not impair his judgment and that he knew what he was doing when he drank. The testimony also impeaches Defendant's statements that he would sit down and not do anything when drinking. The challenged testimony indicates that Defendant, when drinking, did engage in activities of a sexual nature, contrary to what his testimony represented. The Court therefore concluded that the Rule 403 balancing weighed in favor of admitting the evidence because the exposure testimony had significant probative impeachment value that was not outweighed by its potential for unfair prejudice.

Dist. Ct. Dkt. No. 60, Mem. Op. & Order, at 10.

**II. Analysis**

Evidence of the exposure incident was admitted solely for purposes of impeachment, that is, to show that Mr. Cerno's testimony to the jury was not truthful. Black's Law Dictionary (8th ed. 2004) defines impeachment as "[t]he act of discrediting a witness, as by catching the witness in a lie. . . ." The Rules of Evidence state that, to be admissible for impeachment, evidence must be "probative of truthfulness or untruthfulness," and must "concern[] the [defendant's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).

If there is evidence that "specific[ally] contradict[s]" a witness's testimony, impeachment evidence is admissible to demonstrate that the witness lacks credibility and has a propensity for lying. *United States v. Crockett*, 435 F.3d 1305, 1313 (10th Cir. 2006).

The transcript does not reveal any statements by Mr. Cerno that were revealed as untruthful by admission of evidence of the exposure incident. The prosecutor argued repeatedly that the episode contradicted Mr. Cerno's claim that he was a "benign drunk." Defendant never described himself in this way. He testified that his drinking was a factor in breaking up his marriage and had impaired his health. He testified that he would pass out from drinking (but not to the point of failing to remember what he had been doing) and testified to his typical conduct when at home in the evening, which consisted of drinking by himself outside or occasionally sneaking into the house to drink and watch television when his mother was not home. He did not state that he never watched pornography; he was never asked. And he did not state that he never masturbated; again, he was never asked. It is hard to see how the exposure incident contradicted anything to which he testified.

When the district court finally decided to admit the exposure matter, the judge expressed his belief that the incident contradicted Mr. Cerno's testimony that "he was completely in control of his senses, he didn't lose his judgment. That much is clear, that he lost it then." Tr. 376. This statement suggests two

-11-

slightly different versions of the court's rationale for admitting the evidence: that the exposure matter indicated Mr. Cerno "los[t] his judgment" when drinking, and that it demonstrated that Mr. Cerno was not "completely in control of his senses." These two concerns are further reflected in the court's colloquy with the prosecutor and in its written ruling. After the court expressed its reasons for admitting the evidence, the prosecutor jumped in to add that Mr. Cerno "also said that he has never drunk to the point where he passed out and didn't remember what he was doing," to which the judge responded: "Yes. That's pretty clear, in that he denies that his judgment was impaired, and I submit that that occasion flies in the face of his denial of losing judgment." Tr. 377. In the court's written ruling, the judge stated first that "[t]he testimony at issue impeaches Defendant's claims that drinking did not impair his judgment and that he knew what he was doing when he drank." But the record does not bear out the court's concerns.

It is important to stress that the defendant's references to impairment of his judgment all were in connection with his memory. On cross-examination Mr. Cerno stated: "[s]ix to eight cans [of beer] all day long isn't going to impair my judgment *to where I don't know what I'm doing.*" *Id*. at 362 (emphasis added). The prosecutor repeated Mr. Cerno's full statement back to him, and Mr. Cerno confirmed that this was correct. *Id*. Mr. Cerno never testified that he exercised perfect, or even good, judgment in other respects.

Mr. Cerno's belief that the references to impaired judgment related to memory is logical, and is further substantiated by the record. This case was essentially a contest over which witness the jury would believe. It is evident that Mr. Cerno understood all questions along these lines as essentially an attack on whether he had an accurate memory of what had taken place and thus whether the jury could credit his account. Even after the prosecutor asked Mr. Cerno about the exposure incident, the following exchange occurred:

> Q. And you've learned that [the alleged victim] and two other people came back from the wake and saw you passed out, with your penis exposed, watching a pornographic movie.
>
> A. Yes.
>
> Q. And you would not agree with me? You wouldn't agree that your judgment was impaired?
>
> A. No, because I was watching it. I remember watching it.

Tr. 381. It is thus perfectly clear that Mr. Cerno's testimony that his judgment was not impaired when he was drinking, even to the point of passing out, was nothing more than a statement that he remembered what he was doing. That was in no way impeached by evidence of the incident, which he remembered.

As to the second version of the court's rationale, Mr. Cerno never asserted he was "completely in control of his senses." He openly admitted that he would drink to the point of passing out. Tr. 324, 342–43, 345. That he passed out on the night of the exposure incident is entirely consistent with his testimony, and

the remainder of the incident is irrelevant to it.  In his direct testimony, Mr. Cerno carefully distinguished between "passing out" (when he remembered the next day what he had been doing) and "blacking out" (when he had no such memory).  He testified that he "passed out" but did not have "black outs."  The district judge, however, questioned whether there is truly any distinction between passing out and blacking out.  *See* Tr. 377 ("You know, you can define 'passing out' any way you want to.  If he's unconscious, drunk, he is blacked out, passed out, whatever.").  Assuming that there was not, the district court judge concluded that the exposure incident contradicted Mr. Cerno's testimony.  But the question is not whether Mr. Cerno was using language properly; it is whether he was lying and whether the exposure incident proved he was lying.  Since he remembered what he was doing the night of the exposure incident, *see* Tr. 381, 383–84, despite having passed out, the district court was wrong to conclude that the incident showed he was lying.

The next rationale in the judge's written ruling was that "[t]he testimony also impeaches Defendant's statements that he would sit down and not do anything when drinking.  The challenged testimony indicates that Defendant, when drinking, did engage in activities of a sexual nature, contrary to what his testimony represented."  The majority does not rely on this portion of the written order, concluding that the first rationale was sufficient.  Maj. Op. 13–14.  This rationale is equally unsupported on the record.  The judge's idea that the

defendant said he "would sit down and not do anything while drinking," derives from his testimony that

> Well, if I passed out, well, I passed out. If I was sitting in the truck, I would ask my mom: I'm going to get the keys and sit in the truck. And she knew I wasn't going to drive anywhere. So I would just sit there, and the alcohol would just make me relax and just want to sit there and not do anything.

Tr. 345. He did not testify that he *never* did anything when drinking. The quoted testimony is merely a description of what he would want to do "if he was sitting in the truck." He testified on the previous page of the transcript that sometimes he would "be out with my friends or my relatives back in McCarty, where I was drinking." *Id*. at 344. He was not asked, and he did not volunteer, what he did with them on those occasions. More importantly, he had already testified that sometimes, when his mother was away from the house, he "sneaked" in and watched television while drinking. *Id*. at 338. That is precisely what happened on the night of the incident. Mr. Cerno was not asked what he watched, and he did not volunteer it; he was not asked whether he ever did anything of a sexual nature when drinking, and he did not volunteer it. That he watched pornography and apparently did something of a sexual nature that evening is not impeachment when he never was asked, and never denied, doing things of that nature. It is an enormous stretch to say that a defendant may be "impeached" by evidence of a highly prejudicial character in order to show that he was lying when he testified that during the occasions when he drank in the truck, he would just sit there and

-15-

relax and not want to do anything. His testimony to that effect could be entirely truthful, even if on other occasions he did other things of a less innocuous nature while drinking.

In short, the reasons given for admitting the evidence as impeachment were based on an inaccurate recollection of Mr. Cerno's very careful, and precise, testimony. Mr. Cerno never testified that he did not pass out. He never called himself a "benign drunk" or even claimed that he exercised "good judgment"; nor did he say that he always "did nothing" while drinking. Because the exposure incident did not actually contradict any of Mr. Cerno's testimony, it had no probative impeachment value.

I therefore respectfully dissent from Part II of the majority's opinion.