**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 18, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SAMUEL K. MITCHELL

    Defendant-Appellant.

No. 12-3220

(D.C. No. 2:11-CR-20062-CM-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **ANDERSON** and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, submitted without oral argument.

Samuel Mitchell pleaded guilty to conspiracy to distribute and possess with the intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 846, and

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced him to 121 months' imprisonment, and Mitchell appeals that sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

In 2010, the Lenexa, Kansas, Police Department began investigating Samuel Mitchell for trafficking cocaine after it received a tip from a confidential informant. In October 2010, the confidential informant participated in two controlled buys. On each of the two occasions, the confidential informant paid Mitchell $300 for half an ounce of cocaine, yielding a price of $21.40 per gram of cocaine. On October 28, 2010, the confidential informant ordered an ounce of cocaine from Mitchell, and Mitchell was arrested after he arrived at the agreed-upon location to deliver the cocaine. After his arrest, Mitchell admitted to police officers that he sold cocaine with Javier Mendoza and that there were drug proceeds, packaging materials, scales, and cutting agent (material used to dilute pure cocaine) located in his home. Police officers searched Mitchell's home pursuant to a search warrant, and they found 309.9 grams of cocaine, $2,700 in cash, as well as a Glock handgun case, handgun magazines, a bullet proof vest, ammunition, and a shooting range membership card in Mitchell's bedroom.

Following Mitchell's information regarding Mendoza, the police obtained a search warrant and searched Mendoza's house in February 2011 and found over 200 grams of cocaine. Mendoza then began to cooperate with law enforcement in its case against Mitchell.

On July 13, 2011, a grand jury indicted Mitchell on one count of conspiracy to distribute and possess with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 846 and three counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The indictment alleged that the conspiracy occurred from on or about October 21, 2010, to on or about February 22, 2011, and that the conduct underlying the three counts of distribution all occurred in October 2010. Mitchell pleaded guilty to the charges against him on April 2, 2012.

According to Mitchell's presentence report ("PSR"), his criminal history category was II. Using a conversion ratio of $21.40, which was the price charged in the two controlled buys, the PSR converted cash and other assets that Mitchell possessed into 6,621.7 grams of cocaine. This total calculated drug quantity yielded a base offense level of 32 under Sentencing Guideline § 2D1.1(c)(4). Two additional offense levels were then added, in accordance with Sentencing Guideline § 2D1.1(b)(1), for possession of firearms during the drug trafficking offense. After a three-level reduction for acceptance of responsibility under Sentencing Guideline § 3E1.1, Mitchell's total offense level was 31, resulting in a calculated Guidelines range of 121 to 151 months' imprisonment.

Mitchell made three objections to the PSR. First, he objected to several factual assertions in the PSR, which were based on Mendoza's proffered statements, arguing that they lacked "the indicia of reliability necessary for consideration at sentencing." R., Vol. 3 at 28. Second, Mitchell argued that the conversion ratio used to calculate drug quantity should be $65.00 a gram, which would yield 2,442.73 grams of cocaine. Assuming no

-3-

other changes to his Guidelines calculation, Mitchell's total offense level under his proposed calculation would be 27, and his Guidelines range would be 78 to 97 months' imprisonment. Id. at 32. Mitchell also disputed the two-level enhancement for possession of firearms. Without the two-level enhancement, but assuming no other changes to his Guidelines calculations, Mitchell's total offense level would be 29, and his Guidelines range would be 97 to 121 months' imprisonment. Id. at 35.

At the conclusion of the sentencing hearing, the district court rejected Mitchell's arguments and sentenced him to a within-Guidelines sentence of 121 months' imprisonment. Mitchell appeals his sentence.

## II

Mitchell presents two sentencing issues: (1) whether the district court's conversion ratio was clearly erroneous, and (2) whether the district court erred in applying the two-level firearm enhancement. We review the district court's legal conclusions pertaining to the Guidelines de novo, but we review the district court's factual findings, "including its determination of the quantity of drugs for which the defendant is held accountable under the Guidelines for clear error." United States v. Todd, 515 F.3d 1128, 1135 (10th Cir. 2008). A finding is "clearly erroneous only when 'the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made.'" Id. (quoting United States v. Dalton, 409 F.3d 1247, 1251 (10th Cir. 2005)). In pursuing sentence enhancements, "[t]he government bears the burden of proving sentencing enhancements by a preponderance of the evidence." United States v.

Orr, 567 F.3d 610, 614 (10th Cir. 2009).

*Conversion Ratio*

"[I]n a case where cash is seized and where either no drug is seized or the amount seized does not reflect the scale of the offense, the sentencing court may estimate the quantity of drugs with which Defendant was involved by converting cash to its drug equivalent." United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994). This conversion is appropriate "provided the court finds by a preponderance that the cash is attributable to drug sales which were part of the same course of conduct or common scheme or plan as the conviction count." Id.; see also U.S.S.G. § 2D1.1 cmt. n.12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").[1]

Mitchell does not dispute this general methodology of converting cash and assets to their drug equivalent quantities. However, Mitchell contends that the district court erred in "utterly failing to synthesize conflicting evidence on the quantity question," arguing that "[a]lthough some of [Mitchell's] customers received cut-rate cocaine at as low as $21.40 a gram, the evidence was completely clear that many of them did not."

---

[1] We apply the 2011 version of the Sentencing Guidelines, which were in effect when Mitchell was sentenced in August of 2012. All references to the Guidelines are to the 2011 version. See United States v. Antonio-Agusta, 672 F.3d 1209, 1211 n.2 (10th Cir. 2012). We note that the 2011 version of the Sentencing Guidelines does not "provide[] a higher applicable Guidelines sentencing range than the version in place at the time of the offense." Peugh v. United States, __ S. Ct. __, No. 12-62, 2013 WL 2459523, at *3 (June 10, 2013).

Aplt. Br. at 16. Mitchell points to Mendoza's testimony at the sentencing hearing, when

Mendoza explained that Mitchell sold an 8-ball (3.5 grams) of pure cocaine for $250, at a

price of $71.40 per gram, to some customers. Mitchell also argues that selling cocaine at

a price of $21.40 per gram to all customers makes no business sense because at that price,

Mitchell would be selling cocaine at a loss of almost $9,000 per kilogram. The $21.40

per gram conversion ratio, Mitchell contends, is also significantly different from Drug

Enforcement Agency ("DEA") price estimates of $80 to $100 per gram.[2]

After a sentencing hearing, the district court found that $21.40 per gram was an

appropriate conversion ratio:

> [T]here was evidence that the controlled buys in this case
> were for $300 for a half ounce. This converts to $21.40 a
> gram. The court believes that this calculation is the most
> reliable method to use in this case. It represents the use of
> actual sales instead of hypothetical speculative prices.

R., Vol. 2 at 168. The district court also found that Mendoza's testimony corroborated

the PSR's calculated base offense level:

> [T]here also was testimony from Mr. Mendoza regarding his
> observation that he actually viewed a kilogram of cocaine in
> defendant's bedroom on six or seven different occasions.
> That by itself would arrive at the base offense level that was
> set out in the presentence investigation report.

Id. at 169. Mitchell argues that his sentence should be reversed because the district court

erred when (1) "it imposed a single conversion ratio based on the controlled buys when

---

[2] Although Mitchell argued for a $65.00 conversion ratio in district court, Mitchell does not specify on appeal an alternate conversion ratio to calculate drug quantity.

that ratio was contradicted by the record, DEA drug price estimates, and common sense,"

and (2) "it backstopped its erroneous findings by relying on contradictory testimony."

Aplt. Br. at 20.

Commentary to the Sentencing Guidelines explains that in approximating drug quantity, "the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." U.S.S.G. § 2D1.1 cmt. n.12. Here, the district court considered "similar transactions in controlled substances by the defendant," id., specifically, actual prices that Mitchell charged the confidential informant in the two controlled buys. Although Mendoza testified that Mitchell charged higher prices for pure cocaine and that he offered discounts to repeat customers, there is nothing in the record regarding how often Mitchell sold pure cocaine as opposed to cut cocaine, or how many of his customers were repeat customers who purchased drugs at a lower price. Absent such evidence, we agree with the district court that the use of a $65.00 conversion ratio would be based on "hypothetical speculative prices" that are unsupported by a preponderance of the evidence. R., Vol. 2 at 168. And contrary to Mitchell's claim that selling at a price of $21.40 per gram would make no business sense, selling at that price point would be profitable if the volume of cocaine sold included a cutting agent.[3]

_____

[3] As the government points out in its brief, if Mitchell mixed each gram of cocaine with an equal amount of cutting agent, he would be able to sell two grams of cut cocaine

(continued...)

As regards the DEA estimate of $80 to $100 per gram, we do not find this estimate

in the DEA publication that Mitchell cites.  In his objection to the PSR, Mitchell cited to

U.S. Department of Justice National Drug Intelligence Center, National Drug Threat

Assessment 2010 (2010) [hereinafter DEA Drug Assessment], available at

http://www.justice.gov/archive/ndic/pubs38/38661/38661p.pdf.  Mitchell cited to Figure

4 of the DEA Drug Assessment for the proposition that a $65.00 conversion ratio "is

more consonant with the DEA estimate of midlevel cocaine sale prices, which the DEA

estimates as between $80-$100 [a gram[4]] during the life of this conspiracy."  R., Vol. 3 at

31.  However, Figure 4 of the DEA Drug Assessment lists total federal cocaine seizures

from 2005 to 2009 and does not contain any information regarding cocaine sale prices.

Figure 5 of the DEA Drug Assessment presents a graph that states:  "From January 2007

through September 2009, the price per pure gram of Cocaine increased 75.4%, from

$99.24 to $174.03, while the purity decreased 31.5%, from 67% to 46%."  DEA Drug

Assessment at 28.  But as the DEA Drug Assessment explains, the cocaine price data is

compiled from domestic drug exhibits sent to DEA laboratories from the DEA, Federal

Bureau of Investigation, Customs and Border Protection, Immigration and Customs

Enforcement, United States Coast Guard, and Washington Metropolitan Police

---

[3](...continued)
for each gram of pure cocaine.  At a price of $21.40 per gram of cut cocaine, he would
actually make a profit of $12.80 per gram.  See Aplee. Br. at 20.

[4] The original text of Mitchell's objection to the PSR mistakenly stated "ounce,"
which Mitchell's counsel corrected to "gram" at the sentencing hearing.  See R., Vol. 2 at
9.

Department.  Consequently, the pricing information contained in the DEA Drug Assessment is "not a representative sample of drugs available in the United States," and the data "are not collected to reflect national market trends."  Id.

Regarding Mendoza's credibility, we agree with the district court that his testimony was credible.  Mitchell contends that Mendoza's statement regarding the amount of cocaine that he had observed at Mitchell's house was unreliable as seemingly inconsistent.  Mitchell points to Mendoza's testimony where he stated that he had seen a kilogram of cocaine in Mitchell's bedroom on six or seven occasions, but also that Mitchell purchased a kilogram of cocaine at least every two months—and sometimes more often—during a two-year period.  See Aplt. Br. at 17.  We have held that testimony regarding quantity of drugs sold fails to meet the required burden of proof when there is "flatly contradictory testimony."  United States v. Richards, 27 F.3d 465, 469 (10th Cir. 1994).  But here, Mendoza's testimony that he had seen a kilogram of cocaine in Mitchell's bedroom on six or seven different occasions does not flatly contradict Mendoza's testimony that Mitchell purchased a kilogram of cocaine at least every two months during a two-year period.  See R., Vol. 2 at 24, 37.

Mitchell's calculated drug quantity was "'based on information with a minimum indicia of reliability.'"  United States v. Roederer, 11 F.3d 973, 981 (10th Cir. 1993) (quoting United States v. Guest, 978 F.2d 577, 579 (10th Cir. 1992)).  We conclude that the district court did not err in calculating the drug quantity.

*Firearm Enhancement*

Section 2D1.1(b)(1) of the Sentencing Guidelines provides a two-level sentencing enhancement "[i]f a dangerous weapon (including a firearm) was possessed" during the drug trafficking offense. This "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.3(A).

Under § 2D1.1(b)(1), "[t]he government bears the initial burden of proving possession of the weapon by a preponderance of the evidence," United States v. Williams, 431 F.3d 1234, 1237 (10th Cir. 2005), and this burden "is satisfied when the government demonstrates that 'a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant.'" Id. (quoting Roederer, 11 F.3d at 982). After the government meets this initial burden, "the burden shifts to the defendant to show that it is clearly improbable the weapon was connected with the offense." United States v. Pompey, 264 F.3d 1176, 1181 (10th Cir. 2001) (quotation omitted).

Mitchell argues that although police officers found a Glock handgun case, handgun magazines, a bullet proof vest, ammunition, and a shooting range membership card at his house, police officers did not find a gun at Mitchell's house. Aplt. Br. at 20-21. Police officers also found a holster, receipt and magazines in the car that Mitchell used for drug transactions, but police officers did not find a gun in the car. Mitchell claims that he "gave his uncle three guns in early 2010, guns that he never retrieved and that his uncle would not have given back," and that "[t]here is no record evidence that these guns were

ever possessed in connection with any drug trafficking offense." Id. at 21.

Based on the evidence presented, the district court determined that the two-level firearm enhancement may be applied:

> Application note three to Section 2D1.1B1 states that the enhancement should be applied if a weapon was present unless it's clearly improbable that the weapon was connected with the offense. The court would note the government has met the initial burden of showing that the weapons were located in close proximity to the drugs. The burden then shifts to the defendant to show that it's clearly improbable that the weapons were related to the offense. The court would find defendant has not met his burden here. Guns were found at defendant's uncle's residence, and both his uncle and Mendoza attributed them to defendant. Substantial other evidence of firearms, including a holster, receipt and magazines, were found in the car the defendant used for drug transactions and in the bedroom when there were drugs and drug money elsewhere in the house. Defendant has not shown that it's clearly improbable that the guns related to the drug offense.

R., Vol. 2 at 169-70. Mitchell contends that the district court erred in presuming that the weapons located at his uncle's house were related to the drug trafficking offense when there was no evidence that any drug transactions were conducted in proximity of his uncle's house. Aplt. Br. at 22.

We conclude that the firearms enhancement is warranted. Aside from evidence of firearm-related items in Mitchell's house and evidence that Mitchell kept guns at his uncle's house, there is also evidence that Mitchell had kept guns in his house. Mendoza testified that he had seen guns at Mitchell's house in early 2010. See R., Vol. 2 at 38-40, 53-55. Police reports also corroborate Mendoza's testimony that Mitchell possessed guns

-11-

in his house. According to police reports, in July 2010, Mitchell fired shots in his house and then jumped out of a second story window. Id. at 119. Police then found Mitchell in a neighbor's driveway carrying a silver handgun. Id. at 121-22. Mitchell told police that he was in the second floor of the house when he heard a loud noise coming from the basement and that there was an intruder who fired a shot at him. Id. at 123. Mitchell explained that he was in possession of a couple thousand dollars at the time, and he believed that the intruder had come to rob him. R., Vol. 3 at 8. There is also ample evidence in the record that Mitchell kept cocaine in his house. Mendoza testified that he had seen a kilogram of cocaine in Mitchell's bedroom on six or seven different occasions over a two-year period, R., Vol. 2 at 37, and police officers found more than 300 grams of cocaine in Mitchell's house, along with cutting agent and a digital scale. R., Vol. 3 at 8-9.

At the sentencing hearing, Mitchell argued that there is no evidence that he possessed a firearm "within the charged life of the conspiracy." R., Vol. 2 at 162. However, the § 2D1.1(b)(1) enhancement is not "limited to the charged conspiracy." United States v. Shippley, 690 F.3d 1192, 1200 (10th Cir. 2012); see also Roederer, 11 F.3d at 982; United States v. Rodriguez-Felix, 450 F.3d 1117, 1131 (10th Cir. 2006) (holding that sentencing courts may consider uncharged relevant conduct in calculating a defendant's Guidelines range). Instead, the § 2D1.1(b)(1) enhancement applies to "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1

-12-

cmt. n.1(H); see also Roederer, 11 F.3d at 982-83 (affirming a § 2D1.1(b)(1) enhancement for possession of firearm during uncharged drug trafficking activity).

Given the evidence presented, the government had satisfied its initial burden of showing that "a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." Roederer, 11 F.3d at 982. We agree with the district court that Mitchell did not satisfy his burden that "it is clearly improbable the weapon was connected with the offense." Pompey, 264 F.3d at 1181 (quotation omitted). We conclude that the district court's application of the firearm enhancement was not clearly erroneous.

## III

Accordingly, we affirm.

Entered for the Court

Mary Beck Briscoe
Chief Judge