FILED
United States Court of Appeals
Tenth Circuit

February 12, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JARED LEE TODD,

    Defendant - Appellee.

No. 06-6334

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 04-CR-221-01-L)**

---

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (John C. Richter, United States Attorney, and Edward J. Kumiega, Assistant United States Attorney, Western District of Oklahoma, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

Joseph L. Wells, Oklahoma City, Oklahoma, for Defendant-Appellee.

---

Before **LUCERO, BALDOCK,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

On two separate occasions, police apprehended Jared Lee Todd and

recovered from him small vials that contained, in total, approximately 37 grams

of methamphetamine. In conversations with police, Mr. Todd admitted that his drug dealings went much further, and that he had purchased for redistribution at least two ounces of methamphetamine every month over the last year (680.4 grams in total). Other facts presented to the district court tended to confirm Mr. Todd's admission. After a jury convicted Mr. Todd of two counts of possessing methamphetamine with intent to distribute, the district court, in calculating the total attributable drug quantity for purposes of the United States Sentencing Guidelines, used only the 37 grams of methamphetamine actually confiscated from Mr. Todd. The court then proceeded to expressly rely on the recommended sentencing Guidelines range for that amount in assigning a sentence to Mr. Todd.

While the Supreme Court's recent opinion in *Gall v. United States*, 128 S. Ct. 586 (2007), underscores the discretion district courts are properly due in sentencing, it also reiterates that courts must begin their analysis by calculating correctly the applicable Guidelines sentencing range. Though a district court may choose ultimately to depart or vary from the Guidelines, a properly calculated Guidelines range is, the Court explained, "the starting point and the initial benchmark" in any sentencing decision. *Id.* at 596. In this case, all of the evidence on record, including testimony of Mr. Todd's own admission, indicated that he possessed with the intent to distribute quantities of methamphetamine far in excess of 37 grams. In light of this overwhelming evidentiary imbalance, we are obliged to hold that the district court's use of that drug quantity when

calculating the advisory Guidelines range was clearly erroneous, and, given its reliance on the Guidelines when passing sentence, we cannot say the court's error was harmless.

I

A

In the fall of 2004, the Oklahoma City Police Department learned from two separate sources that Mr. Todd was selling methamphetamine.

First, in September 2004, Detective Kenneth Russell Park interviewed Christopher Spindler in connection with a shooting involving members of the Universal Aryan Brotherhood, a white supremacist group. During the interview, Mr. Spindler revealed, among other things, that he had obtained methamphetamine from Mr. Todd, that he had observed Mr. Todd sell methamphetamine "countless times," and that Mr. Todd's principal supplier was Greg Minard. Months earlier, in March 2004, Detective Park himself had inspected a methamphetamine laboratory operated by Mr. Minard.

Second, a little over a month after the interview with Mr. Spindler, an anonymous caller informed Detective Park that Mr. Todd was selling drugs from the trailer in which Mr. Todd lived, and that he had recently seen Mr. Todd with a gun. Detective Park asked the caller to contact him again at a time when the caller could confirm that Mr. Todd had drugs at his trailer. The informant did so approximately one week later, on November 8, 2004.

In light of these events, the police visited Mr. Todd's trailer that very evening and found Mr. Todd and two others inside a storage shed next to the trailer. Detective Park identified himself as a police officer and asked Mr. Todd if they could talk. Mr. Todd agreed, but, before approaching Detective Park, he took something from his front pocket and threw it about ten feet away inside the shed. Police handcuffed Mr. Todd when he emerged from the shed, and they retrieved the thrown object. Detective Park and Mr. Todd walked to Detective Park's car and talked there for approximately 40 minutes, during which time Detective Park removed Mr. Todd's handcuffs. While they spoke, other officers advised Detective Park that the object Mr. Todd had thrown was a packet that appeared to contain about an ounce of methamphetamine. Mr. Todd subsequently granted written consent to search his premises and was advised of his *Miranda* rights.

During the conversation with Detective Park, Mr. Todd admitted to distributing methamphetamine. Confirming Mr. Spindler's account, Mr. Todd stated that Mr. Minard was his principal supplier and explained that he purchased from Mr. Minard at least one quarter ounce of methamphetamine at least twice a week. Additionally, Mr. Todd identified four other individuals who also supplied him with drugs. All told, Mr. Todd admitted that, over the course of the past year, he obtained for redistribution at least two ounces of methamphetamine per month. He stated that he typically sold the methamphetamine in quantities of one

half ounce or less and that he sold the drugs in order to support his own methamphetamine habit. In addition to purchasing methamphetamine from Mr. Minard, Mr. Todd admitted that, on at least two occasions, he supplied Mr. Minard's laboratory with precursor chemicals for methamphetamine, including pseudoephedrine and toluene.

In the same conversation, Mr. Todd told Detective Park that he had recently possessed a handgun, which he purchased because he feared some of his fellow members in the Aryan Brotherhood. Mr. Todd further related that he had fired the gun at Tracy Brunkin, another member of the Brotherhood, during a recent argument between the two, and he showed Detective Park the bullet hole from that shot in the sheet-metal fence on the property. Mr. Todd stated that he no longer had the gun as he had recently sold it to another methamphetamine dealer. At the conclusion of their conversation, Detective Park formally placed Mr. Todd under arrest.

Ten days later, after Mr. Todd's release on bail, police again visited Mr. Todd's trailer. Detective Park testified that, as he and other police arrived at the trailer, Mr. Todd began running away. Police gave chase, and, as they closed in on him, Mr. Todd grabbed what appeared to be a pill bottle from his front pocket and threw it over a nearby fence. While other officers apprehended Mr. Todd and placed him under arrest, Detective Park recovered the pill bottle, which contained a bag of white powder appearing to be methamphetamine. According to Detective

Park, when Mr. Todd saw him holding the pill bottle, Mr. Todd stated, "Detective Park, that's 18 grams in there, not 20." Detective Park explained at trial that he understood Mr. Todd to be referencing the difference, under Oklahoma state law, between the charge of possession of a controlled dangerous substance and the charge of trafficking in methamphetamine, the latter of which carries a heavier penalty but is not applied unless the suspect is found with drugs weighing at least 20 grams. Initial field tests indicated that the bag indeed contained approximately 18 grams of methamphetamine.

One additional person subsequently gave the government information about Mr. Todd's dealings with methamphetamine and Mr. Minard. Sharon Patnaude lived intermittently at Mr. Minard's house over a period of several months and assisted him in manufacturing methamphetamine. She informed prosecutors, and later testified at trial, that, between November 2003 and January 2004, she saw Mr. Todd at Mr. Minard's house on two or three occasions. She also testified that, on at least one such occasion, she saw Mr. Todd visit Mr. Minard in his bedroom, where Mr. Minard conducted all of his drug transactions, and that Mr. Todd had an "eight-ball" – or about 3.5 grams – of methamphetamine with him when he exited Mr. Minard's room.

B

An indictment filed February 1, 2005, included four charges against Mr. Todd: (1) conspiracy to manufacture and possess with intent to distribute 50

grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); (2) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); (3) possession with intent to distribute 26 grams of methamphetamine (the quantity recovered from the first container tossed away by Mr. Todd), in violation of 21 U.S.C. §§ 841(A), (b)(1)(C); and (4) possession with intent to distribute 18 grams of methamphetamine (the quantity recovered from the second thrown container), also in violation of 21 U.S.C. §§ 841(A), (b)(1)(C).

After a pretrial hearing, the district court granted Mr. Todd's motion to dismiss the firearm count, ruling that Mr. Todd's admission to Detective Park, without additional corroboration, was insufficient evidence of Mr. Todd's gun possession as a matter of law. The case proceeded to trial on the other three counts. At the close of the government's case, the district court *sua sponte* granted a judgment of acquittal on the conspiracy count, finding insufficient evidence to demonstrate Mr. Todd's participation in Mr. Minard's methamphetamine manufacturing and distributing activities. Specifically, the court found Ms. Patnaude's testimony insufficient because she had only seen Mr. Todd with a relatively small amount of methamphetamine (less than the 50 gram minimum mentioned in Count 1 of the indictment) at Mr. Minard's house, and had not seen Mr. Todd assist in producing methamphetamine. In addition, the court found Detective Park's testimony regarding Mr. Todd's admission that he

provided Mr. Minard with chemicals failed to provide any time reference to match the admission with the conduct and time period charged in the indictment. Accordingly, only the two substantive counts of possession with intent to distribute were submitted to the jury at the close of the trial. The jury convicted Mr. Todd on both counts.

At sentencing, the probation office's presentence report ("PSR") recommended a base offense level of 32, based on a total of 717.4 grams of methamphetamine. Although the two containers of methamphetamine found on Mr. Todd by police amounted, after further testing, to only 37 grams,[1] the PSR also included an estimate of 680.4 grams based on Mr. Todd's admission to Detective Park that he purchased for redistribution at least two ounces per month over the past year.[2] The PSR further recommended a two-level enhancement for Mr. Todd's admission of possessing a firearm, and a two-level enhancement for unsafe storage of chemicals, which related to Mr. Todd's admission that he supplied chemical materials to Mr. Minard's methamphetamine laboratory. With

---

[1] The actual weight of the methamphetamine recovered from the two containers (23 grams and 14 grams) differed slightly from the quantities derived from initial field tests (26 grams and 18 grams), which served as the basis for the quantities specified in the indictment.

[2] One ounce equals approximately 28.35 grams. *See* Presentence Investigation Report at 6. Two ounces per month for a year equals 24 ounces, or 680.4 grams.

a total offense level of 36 and a criminal history category of V, the PSR produced a recommended sentencing range of 292-365 months imprisonment.

Mr. Todd offered a number of objections to the PSR, including its drug quantity calculation and its recommended enhancements. After hearing argument on the objections, the district court stated:

> [T]he Court has had the opportunity, both through pretrial hearings and the trial, to hear all the evidence, and the Court finds that the – there is not a preponderance of the evidence to support the amount of methamphetamine to support a base level of 32, but, rather, based upon both the evidence and the jury's findings, the Court finds that the amount of drugs that should be attributable to Mr. Todd are 37 grams, which would create a base offense level of 22, and that neither the enhancement in Paragraph 25 [firearm possession] or the enhancement in 26 [unsafe chemical storage], there's not a preponderance of the evidence to support both of those enhancements.

July 8, 2005, Sentencing Tr. at 26-27. Pursuant to the district court's findings on the number of grams attributable to Mr. Todd, the recommended Guidelines sentencing range was 77 to 96 months, and the court imposed a mid-range sentence of 86 months.

Prior to sentencing, but after the trial and conviction, the government filed an appeal of the district court's dismissal of the firearm charge, and after sentencing, the government also appealed the 86-month sentence. This court consolidated those appeals and issued an opinion in *United States v. Todd*, 446 F.3d 1062 (10th Cir. 2006). On the firearms charge, we reversed the district court's dismissal and remanded for reinstatement of that count. Specifically, we

held that, even if the government's only evidence on the charge was Mr. Todd's admission to Detective Park that he had possessed a gun, that admission was more than sufficient to avoid dismissal. *See id.* at 1067-69. As for the sentencing appeal, we held that, because the government filed a notice of appeal on the firearms charge dismissal prior to sentencing, the district court had been divested of its jurisdiction and should not have held a sentencing hearing or entered any judgment until the appeal was resolved. *See id.* at 1069. As such, we vacated Mr. Todd's sentence and remanded for resentencing. *See id.*

C

On remand, the district court, at the government's request, dismissed the reinstated gun charge without prejudice so that the court could proceed immediately to resentencing on the drug charges. At the resentencing hearing, the government did not argue for either of the enhancements it had previously recommended, but did renew its argument that the "admitted" quantity of methamphetamine (680.4 grams) be included in calculating the base offense level, which would have produced a recommended sentencing range of 188-235 months. The district court, however, once again included only the 37 grams of recovered methamphetamine in its base offense level calculation, stating that it was "going to adopt its rulings that it made in the original sentencing hearing as it relates to the presentence report, the objections made, and the arguments made based upon the evidence that the Court ha[d] heard in all these hearings." Oct. 4, 2006,

Sentencing Tr. at 7. Additionally, the court stated that it was "aware of the various sentences that persons related, Mr. Sumrall, Mr. Minard, Mr. Spindler, and Mr. Lynch, received in this matter, . . . [and] the Court feels that the appropriate sentence and reasonable sentence in this matter can be determined from all of these factors." *Id.* at 8. The district court then reimposed the 86 month sentence.

The government now appeals the sentence once again, arguing in principal that the district court erred by not including the 680.4 grams in calculating Mr. Todd's base offense level under the advisory Guidelines.

II

In *United States v. Booker*, 543 U.S. 220, 261 (2005), the Supreme Court suggested that appellate courts may review sentencing determinations for "reasonableness," a standard the Court recently explained translates into review for abuse of discretion. *See Rita v. United States*, 127 S. Ct. 2456, 2465 (2007); *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *see also United States v. McComb*, ___ F.3d ____, 2007 WL 4393142 (07-5003) (10th Cir. 2007).[3] The

---

[3] "That is to say, we recognize that in many cases there will be a range of possible outcomes the facts and law at issue can fairly support; rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices. And there are perhaps few arenas where the range of rationally permissible choices is as large as it is in sentencing, a task calling on a district court's unique familiarity with the facts and circumstances of a case and its judgment in balancing a host of incommensurate and disparate considerations, ranging from the degree of the

(continued...)

Court in *Gall* also stressed that this abuse of discretion standard applies equally whether the district court imposes a sentence within or outside of the Guidelines-recommended range. *See id.* at 594-98.[4] But whatever sentence the district court ultimately chooses, *Gall* emphasized that, as a matter of procedural regularity, the "starting point and the initial benchmark" for any sentencing decision must be a correctly calculated Guidelines sentencing range. *See id.* To that end, *Gall* indicated that, on appellate review, our first task remains to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . [or] selecting a sentence based on clearly erroneous facts." *Id.* 597; *see also United States v. Kristl*, 437 F.3d 1050, 1054-55 (10th Cir. 2006). When a district court does err in calculating the applicable Guidelines range, we must remand for resentencing,

_____

[3](...continued)
defendant's cooperation and remorse to the need for deterring potential future offenders. Nonetheless, we will not hesitate to find abuse where a decision is either based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *McComb*, at *3 (internal citations and quotation marks omitted).

[4] Thus, while we are still permitted on appellate review to afford within-Guidelines sentences a presumption of reasonableness, *see id.* at 597, given the applicability of abuse of discretion review to sentences both within and outside of the Guidelines, it is unclear what such a presumption entails. Happily, we need not confront that puzzle today because the question we face in this case – whether a district court correctly calculated the recommended sentencing range under the Guidelines – is antecedent to the question whether the sentence itself is substantively reasonable. *See id.* at 596.

whether or not the district court's chosen sentence is substantively reasonable, unless we are able to ascertain that the court's calculation error was harmless. *See Kristl*, 437 F.3d at 1054-55.

In determining whether the district court correctly calculated the recommended Guidelines range, we review *de novo* the district court's legal conclusions pertaining to the Guidelines and review its factual findings, including its determination of the quantity of drugs for which the defendant is held accountable under the Guidelines for clear error. *See id.* at 1055; *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993). Drug quantities employed by the district court to calculate the applicable Guidelines range may be said to be clearly erroneous only when "the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005); *see also United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1119 (10th Cir. 2007) (holding that, for a finding to be clearly erroneous, the "finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer").

The government contends that the district court's Guidelines calculation in this case was premised on just such a clear factual error. Specifically, the government contests the district court's finding that Mr. Todd was only proven to have possessed and distributed 37 grams of methamphetamine, asserting that such

- 13 -

a finding has no factual support in the record before us, which includes the uncontroverted testimony of Mr. Todd's admission of possessing at least two ounces per month. We are constrained to agree.

## A

The balance of facts in this case could not be more one-sided. Detective Park testified that Mr. Todd admitted purchasing for redistribution at least two ounces of methamphetamine per month over the course of the year, or 680.4 grams in total. Mr. Todd has not challenged, contested, or contradicted that testimony in any way, and we have specifically held that a defendant's admissions can in these circumstances serve as a proper basis of a court's drug quantity calculation under the Guidelines. *See United States v. Wacker*, 72 F.3d 1453, 1478 (10th Cir. 1995) ("A district court may base its estimate of drug quantity upon a defendant's own statements and admissions."); *see also* Fed. R. Evid. 804(b)(3) (statement against interest is admissible evidence). As such, Mr. Todd's admission, absent any reason to discredit it, would tilt the evidentiary balance heavily in the government's favor even if standing alone.[5]

---

[5] That the district court may not have fully appreciated the evidentiary value of Mr. Todd's admissions is suggested by its pretrial dismissal of the firearms charge, which we subsequently held to be an abuse of discretion in light of Mr. Todd's statement to Detective Park that he had indeed possessed a firearm. *See Todd*, 446 F.3d at 1069. We of course recognize that, as an appeal from a pretrial dismissal, the evidentiary standards and standards of review in that appeal differed from those of the present. But the general principle that a defendant's admissions cannot simply be disregarded applies with equal force here.

Mr. Todd's uncontested admission, however, does not stand alone, but is joined by numerous other facts suggesting his possession of drugs in quantities much higher than 37 grams. For example, the quantities of methamphetamine confiscated from Mr. Todd themselves lend credence to his admission that he regularly purchased for redistribution at least half an ounce a week (or at least one quarter ounce twice a week). On the first encounter with police, Mr. Todd had with him about 0.8 ounces (23 grams). Ten days later – after his initial arrest and release on bail – Mr. Todd was again found with about half an ounce (14 grams). In other words, Mr. Todd followed precisely the drug-purchasing routine that he had described to Detective Park, purchasing about half an ounce in the week or so after his release.

Further, Ms. Patnaude testified that she had seen Mr. Todd in Mr. Minard's methamphetamine laboratory on multiple occasions and had witnessed Mr. Todd in possession of methamphetamine. Mr. Spindler, in his interview with Detective Park, stated that he witnessed Mr. Todd selling methamphetamine to him and others "countless times." The anonymous informant who correctly indicated to police when and where Mr. Todd possessed methamphetamine also stated to police that Mr. Todd sold methamphetamine regularly. All of this evidence tends

to corroborate and confirm the quantity of drugs to which Mr. Todd himself admitted possessing and redistributing.[6]

B

In the face of the government's substantial factual showing, Mr. Todd makes no effort to point us to *any* countervailing facts tending to support the district court's finding that he possessed only 37 grams of methamphetamine. Instead, Mr. Todd advances a pair of purely legal arguments seeking to suggest that the district court was legally obliged to disregard the drug quantities specified in Mr. Todd's admission to Detective Park. Both such arguments, however, are foreclosed by our precedent.

1

Mr. Todd first argues that the two ounces of methamphetamine per month that he admitted possessing in his conversation with Detective Park cannot be considered because those quantities were not included in the charges on which Mr. Todd was convicted. The Guidelines themselves, however, require that the

---

[6] To the extent Mr. Spindler's statement and that of the informant constitutes hearsay, "sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability." *United States v. Dazey*, 403 F.3d 1147, 1177 (10th Cir. 2005); *Ortiz*, 993 F.2d at 207 (same holding with respect to anonymous police informants). The district court never indicated any reason to doubt the veracity of these statements, and neither do we perceive any such reason, particularly in light of the statements' conformity with Mr. Todd's uncontested admission, the fact that Mr. Todd was twice caught with drug quantities consistent with his admission, Ms. Patnaude's live testimony at trial, as well as the fact that other aspects of the informant's tip proved to be true.

calculation of the base offense level for the drug charges against Mr. Todd take into account "all acts . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2); *see also id.* § 2D1.1, cmt. 12 ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level.").

Accordingly, we have held that district courts must "aggregate the quantities of drugs that were part of the same course of conduct" when determining a base offense level under the Guidelines.  *United States v. Ross*, 920 F.2d 1530, 1538 (10th Cir. 1990) (internal quotations omitted).  We have further specified that quantities of drugs that satisfy this criteria but for which the defendant was not convicted or even indicted should still be included in the aggregate calculation under the Guidelines.  *See id.*  We reiterated this principle in *United States v. Washington*, and in numerous cases since, explaining that "[t]he guidelines require that all relevant conduct be considered at sentencing. Drug quantities associated with illegal conduct for which a defendant was not convicted are to be accounted for in sentencing, if they are part of the same conduct for which the defendant was convicted."  11 F.3d 1510, 1516 (10th Cir. 1993); *see also, e.g.*, *United States v. Rios*, 22 F.3d 1024, 1027 (10th Cir. 1994); *United States v. Mendez-Zamora*, 296 F.3d 1013, 1020 (10th Cir. 2002); *United States v. Hauk*, 412 F.3d 1179, 1195 (10th Cir. 2005).

There can be no doubt that Mr. Todd's alleged purchase for redistribution of at least two ounces of methamphetamine per month over the course of the year prior to his arrest is precisely the course of conduct that led to his arrest and conviction. Indeed, the quantities that police recovered from Mr. Todd on two separate occasions seem to confirm and reflect the pattern of purchasing and distributing that Mr. Todd conveyed in his interview with Detective Park and that other witnesses described. Importantly, at no time has Mr. Todd denied that the drugs confiscated from him by police were products of the same course of conduct that he described to Detective Park, nor has he offered any evidence to demonstrate that those drugs were the product of some other course of conduct. As such, under our case law the sentencing court was required to consider for sentencing purposes the aggregate estimated amount of the drugs Mr. Todd admitted to possessing, and not just the amounts that police actually seized from him.

2

Mr. Todd separately argues that the district court could not have considered the "admitted" drug quantities because it essentially acquitted Mr. Todd of possessing those quantities when it dismissed the conspiracy charge, and because the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), renders improper any consideration by a sentencing court of conduct for which the defendant was acquitted.

- 18 -

This argument is also precluded by our precedents. The Supreme Court and this circuit have both expressly held that acquitted conduct *can* be considered for purposes of sentencing. In *United States v. Watts*, 519 U.S. 148 (1997), the Supreme Court held that, because different evidentiary standards apply to a jury's verdict (reasonable doubt) than to a court's determination of facts for sentencing (preponderance of the evidence), and because 18 U.S.C. § 3661 specifies that no limitation should be placed on the "information concerning the background, character, and conduct" of a defendant that a district court may consider in sentencing, a sentencing court should not be precluded from considering conduct for which the jury acquitted the defendant but for which there is still a preponderance of the evidence.

Mr. Todd contends that *Watts* is no longer good law after *Booker*. But, although *Watts* was decided before *Booker*, we have expressly held that "[n]othing in *Booker* changes [*Watts*'] analysis." *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005). It was the difference between the jury's standard of proof in convicting a defendant and a judge's standard of proof in sentencing, as well as the mandate in 18 U.S.C. § 3661, that justified the holding in *Watts*. The difference in those standards existed before the installment of the Guidelines, was not altered in any way by the Guidelines, and therefore, along with the enduring force of 18 U.S.C. § 3661, continues to justify *Watts*' holding even after *Booker*'s partial invalidation of the Guidelines. *See id.*

- 19 -

Were we somehow able to overlook the fact that *Watts* forecloses Mr. Todd's argument, it would still fail on its own terms because Mr. Todd was never acquitted of the allegation that he possessed at least two ounces of methamphetamine per month over the last year. It is of course true that the district court granted Mr. Todd an acquittal on the conspiracy charge. But Mr. Todd has failed to demonstrate how that acquittal was in any way a repudiation of his alleged possession of at least two ounces of methamphetamine per month over the last year. In granting the acquittal, the district court based its decision on the lack of evidence relating to Mr. Todd's involvement in helping Mr. Minard manufacture methamphetamine. *See* Trial Tr. at 349-53. Specifically, the district court found a lack of evidence matching Mr. Todd's admission of supplying Mr. Minard with chemicals to the time period specified in the indictment. It also found Ms. Patnaude's testimony insufficient to prove any such activity during the relevant time period because Ms. Patnaude did not witness Mr. Todd assisting in the manufacturing but rather only saw Mr. Todd with around 3 or 4 grams of methamphetamine – an amount far less than the 50 grams specified in the conspiracy charge. *See id.* The district court, however, made no factual finding as to Mr. Todd's possession and distribution of methamphetamine in general, and, as such, its judgment of acquittal on the conspiracy charge did not foreclose an eventual finding that Mr. Todd indeed possessed with intent to distribute at least two ounces per month over the course of the year.

C

Without a viable argument why the district court, as a matter of law, had to disregard the drug quantities that he admitted to possessing and that others tended to confirm, Mr. Todd attempts to rationalize the district court's calculation by suggesting that the court may have determined that some or all of the government's evidence was unreliable or otherwise not credible, and that we must defer to such determinations. We readily concede that district courts are owed great deference when it comes to determining the credibility of witnesses appearing before them. *See, e.g.*, *United States v. Browning*, 252 F.3d 1153, 1157 (10th Cir. 2001) ("The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court."). But the district court made no credibility determinations at Mr. Todd's sentencing, and the record before us does not offer any readily apparent basis to suppose that Mr. Todd's uncontested admission or the remainder of the government's evidence was unreliable or not credible. We are not able to defer to hypothesized credibility determinations that the district court may or may not have had in mind but did not make and which are not readily apparent from a review of the record. Accordingly, and in light of the overwhelming imbalance of the evidence indicating Mr. Todd's possession of much more than 37 grams of

methamphetamine, we are constrained to find the district court's calculation clearly erroneous.[7]

### III

We may affirm a sentence resulting from an incorrect Guidelines calculation only if we are able to say that the error was harmless. In this case, we cannot fairly come to such a conclusion. The district court's use of 37 instead of 680.4 grams as the appropriate drug quantity yielded a suggested Guidelines sentencing range of 77-96 months rather than 188-235 months, and, rather than seek to depart or vary from the Guidelines in some way, the district court expressly relied upon the lesser Guidelines range when passing sentence. Under such circumstances, we cannot say the district court's erroneous calculation was immaterial, and, accordingly, our precedents require us to remand for resentencing. *See Kristl*, 437 F.3d at 1055, 1059; 18 U.S.C. § 3742(f)(1); *Williams v. United States*, 503 U.S. 193, 203 (1992); *see also United States v. Galloway*, 509 F.3d 1246, 1252-53 (10th Cir. 2007) (remanding for resentencing

---

[7] Along similar lines, Mr. Todd argued at sentencing, but not on appeal, that the 680.4 grams should not be attributed to him for sentencing purposes because some of the methamphetamine he obtained each month was for personal consumption rather than distribution. Even if a court could deduct specific quantities that were intended for personal consumption, *cf. United States v. Asch*, 207 F.3d 1238, 1244 n.6 (10th Cir. 2000) (noting we have not yet decided this question), the argument would support only an exclusion of whatever portion of the 680.4 grams was intended for personal consumption.

because a clearly erroneous factual finding resulted in an incorrect application of the Guidelines).

To observe, as we must, that a procedural fault occurred in Mr. Todd's initial sentencing hearing is not, however, to suggest necessarily what result his resentencing hearing should yield. On remand, resentencing proceeds *de novo*. Accordingly, the district court is free to receive any relevant evidence that it could have heard at the first sentencing hearing. It is free to make new findings of fact, credibility determinations, and conclusions of law based on that evidence. *See United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999); *United States v. Ortiz*, 25 F.3d 934, 935 (10th Cir. 1994). And it may impose any reasonable sentence, within or without the Guidelines, consistent with the considerable range of discretion afforded to it. *See supra* note 3.[8]

*Reversed and remanded.*

---

[8] The government appealed the sentence in this case on a second ground, arguing that, in sentencing Mr. Todd, the district court impermissibly considered the sentences received by other defendants in a related case. Because we remand for other reasons, we need not address this issue.