**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 20, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATTHEW CARL CRIPPS,

    Defendant - Appellant.

No. 24-7014
(D.C. No. 6:23-CR-00006-RAW-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, **CARSON**, and **FEDERICO**, Circuit Judges.
_____

Matthew Cripps pled guilty to the distribution of methamphetamine. At sentencing, the district court found he had distributed drugs in such quantities that it increased his sentencing exposure by 365 months. The court based its finding on the hearsay testimony of three anonymous informants. Our precedents allow an increased sentence under those circumstances only if the anonymous statements are reliable and corroborated.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Based on those standards, we conclude the drug quantity calculation lacked reasonable corroboration. Accordingly, we **VACATE** and **REMAND** for additional fact-finding and resentencing.

## I.    Background

Matthew Cripps was part of a drug distribution operation that was disrupted by the Oklahoma Bureau of Narcotics. [R. at 63.] Working with a confidential informant, in November 2021, the Bureau executed an undercover buy from Cripps that involved 24.2 grams of methamphetamine. [R. at 63–64.]

Cripps was arrested and pled guilty to one count of distribution of more than five grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii). [R. at 63.] Cripps anticipated an advisory guidelines range of 84 to 105 months of imprisonment based on the 24.2-gram sale. [R. at 121.] The presentence report, however, included additional drug quantities based on the arrests and statements of three other subjects that the parties identify only as "S1," "S2," and "S3." [R. at 64–65.]

S1 was also arrested in November 2021, for possession of methamphetamine and many firearms. [R. at 64.] After securing a search warrant for S1's phone, authorities found several messages between S1 and Cripps, including two photos of what appeared to be methamphetamine sitting on a digital scale. [*Id.*] In the photos, one baggie weighed 27 grams and the other 26.09 grams. [*Id.*] So the PSR attributed the 24.2 grams seized upon S1's arrest and the 53.09 grams from the cell phone photos to Cripps. [R. at 67.]

2

S2 was arrested in early December 2021 while riding a stolen motorcycle with a defective headlight. [R. at 64–65.] Upon searching the motorcycle, police found a plastic bag containing 38.3 grams of methamphetamine. [*Id.*] Three days after his arrest, S2 informed Bureau agents that he purchased the methamphetamine from Cripps. [R. at 65.] S2 also revealed that he picked up one to two ounces of methamphetamine from Cripps twice the month before. [*Id.*] When asked about the source of Cripps' methamphetamine, S2 said that Cripps had "mentioned going to Oklahoma City to pick up 'kilo's.'" Supp. R. Vol. I at 14. As a result, the PSR attributed 38.3 grams and two ounces (about 56.7 grams) of methamphetamine to Cripps, with the latter quantity added based on S2's interview statement. [R. at 67.]

S3 was stopped in January 2022 for a traffic violation. [R. at 65.] During a search of the vehicle, police officers located several bags containing suspected methamphetamine, a small bag containing several blue tablets suspected to be fentanyl, several cellular devices, two sets of digital scales, a notebook, and several payment cards. [*Id.*] Subsequent testing confirmed that S3 was carrying 221.82 grams of methamphetamine and 5.861 grams of fentanyl. [*Id.*]

During an interview one week later, S3 told authorities she transported and distributed methamphetamine and fentanyl at Cripps' direction. [*Id.*] S3 conveyed that a typical trip involved two kilograms of methamphetamine and that she made two to three trips per week for the previous 11 weeks. [*Id.*] S3 said that on one particular trip she had transported 10 kilograms of methamphetamine for Cripps. [R. at 66.] Based on this information, the PSR attributed 221.82 grams of

methamphetamine (from the traffic stop), 5.861 grams of fentanyl (from the traffic stop), and 54 kilograms of methamphetamine (based on the interview) to Cripps. [R. at 67.]

The new information supplied by these individuals more than quadrupled Cripps' anticipated guidelines range, going from 84–105 months to 360–480 months. [R. at 99.]  Cripps objected to the increased drug quantities beyond what he had admitted to at his change of plea hearing.  [R. at 82–83.]  He challenged the information supplied by S2 and S3 in their interviews as untrue, unreliable, and uncorroborated.  [R. at 82–83, 151.]  Cripps argued that S2's statements about the additional two ounces and S3's comments about the extra 54 kilograms of methamphetamine were mere accusations unsupported by anything beyond their statements to police.  [R. at 150.]

Because of these objections, the government called Bureau Agent Jason Tucker as a sentencing witness.  [R. at 137.]  He testified generally about the statements reflected in the PSR, recounting what the witnesses told him during his investigations.

On cross-examination, Agent Tucker agreed that he had not taken additional steps to verify the information S3 provided about transferring kilograms of methamphetamine for Cripps.  [R. at 146.]  Hearing this, defense counsel asked if Agent Tucker was just taking them at their word, to which he replied, "Yes, sir." R. at 146.  Agent Tucker also testified that arrestees had lied to him over the years to keep themselves out of trouble.  [R. at 144.]

4

The district court overruled Cripps' objection. The court found that the PSR accurately reflected Cripps' conduct, [R. at 152] and concluded that the facts revealed that the substances found in the possession of S1, S2, and S3 were given to them by Cripps. [*Id.*] The court also explained that "there has been no evidence presented to deem the information provided by S2 and S3 as unreliable." *Id.* at 152. Based on these conclusions, the court also found Cripps was responsible for all the methamphetamine that S2 and S3 mentioned in their interviews. [R. at 67, 152.]

After granting a downward variance, the court sentenced Cripps to 240 months' imprisonment. [*Id.* at 166.]

## II. Discussion

Cripps asserts on appeal that reliance on S3's statements was an error. He contends our cases require that drug estimates based on out-of-court statements are appropriate only when the statements bear sufficient indicia of reliability, often demonstrated by corroborating evidence. S3's statements bore no such indicia—they deviated from the other sources' statements, and they lacked meaningful corroboration. Without any corroboration the district court should not have relied on S3's statements to enhance Cripps' drug quantity calculation.

### A. Standard of Review

We review for clear error when reviewing a district court's factual findings of drug quantities attributable to a defendant at sentencing. *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993). Drug quantities used to calculate the guidelines range are clearly erroneous when they lack factual support in the record or "we are left with the

5

definite and firm conviction that a mistake has been made." *United States v. Todd*, 515 F.3d 1128, 1135 (10th Cir. 2008) (quoting *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005)).

### B.    Sentencing Enhancements

At sentencing, district courts are not strictly bound by the Federal Rules of Evidence and "hearsay statements may be considered . . . if they bear some minimal indicia of reliability." *United States v. Ruby*, 706 F.3d 1221, 1229 (10th Cir. 2013). The Sentencing Guidelines echo this point and only require "that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Whether a statement is reliable often turns on corroborating evidence.[1] *See Ruby*, 706 F.3d at 1229; *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990) (affirming sentence enhancement based on "physical and documentary evidence at the trial and by appellant's admissions at his sentencing hearing").

In the drug context, corroboration of drug *quantity* is distinct from corroboration of drug *dealing* in general. Our leading case is *United States v. Ortiz*, where we held that uncorroborated sources alone are not enough to attribute new drug quantities to a defendant in most cases. 993 F.2d at 208. In that case, we rejected a similar increase to the attributable drug quantity based on an anonymous

---

[1] The Guidelines' commentary affirms the need in some cases for additional corroboration: "Out-of-court declarations by an unidentified informant may be considered where there . . . is sufficient corroboration by other means." U.S.S.G. § 6A1.3, cmt. (citing *United States v. Rogers*, 1 F.3d 341 (5th Cir. 1993)).

criminal informant suggesting the defendant distributed large quantities of marijuana over an 18-month period—a far greater amount than any other evidence showed. "The fact that the confidential informant had proven reliable in the past [was] simply not sufficient corroboration . . . of the informant's information regarding the quantity of marijuana that [d]efendant distributed." *Id.* at 208.

To determine the appropriate guidelines range, the district court must consider "all quantities of contraband with which [the defendant] was directly involved" and all quantities involved in reasonably foreseeable transactions by others furthering jointly undertaken criminal activity. U.S.S.G. § 1B1.3, cmt. n.3. If the government did not seize any drugs, the district court is required to "approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, cmt. n.5. In so doing, the court may rely on government estimates if they satisfy the necessary reliability requirements. *See Ortiz*, 993 F.2d at 207; *Ruby*, 706 F.3d at 1229.

The government bears the burden of proving the drug quantity for sentencing purposes by a preponderance of the evidence. *Ortiz*, 993 F.2d at 207.

### C.    *Analysis*

The district court's reliance on S3's statements to enhance Cripps' drug quantities at sentencing does not clear the hurdles set by *Ortiz*. S3's out-of-court statements attributing the extra 54 kilograms of methamphetamine to Cripps lacked the necessary indicia of reliability we have required for out-of-court statements made without additional foundation. *United States v. Roberts*, 14 F.3d 502, 507 (10th Cir. 1993).

The government contends that the sources' statements were consistent because "[a]ll three subjects described [Cripps] as playing a role in the distribution of methamphetamine" and that "the extraction from S1's phone corroborates [Cripps'] involvement in distributing methamphetamine."  Resp. Br. at 20, 21.  This comparison misses the point.  While all three anonymous sources corroborate Cripps' drug dealing, none corroborate dealing in the massive amounts of methamphetamine described by S3.  As we stated in *Ortiz*, "the relevant issue is not whether [d]efendant distributed [drugs], but rather the quantity of [drugs] that [d]efendant distributed." 993 F.2d at 208.  S1 and S2 supplied information that Cripps had dealt in quantities between roughly 20 to 80 grams at a time.  S3, by contrast, attributed more than one thousand times that amount to Cripps—a striking departure from the other sources. The government provided no evidence to support S3's statements about the additional 54 kilograms of methamphetamine other than her say-so.  Given the deviation and Cripps' specific challenge to the evidence, *Ortiz* counsels the government must do more—corroborating witnesses or live testimony from the witness where credibility can be assessed by the court.

Next, the government argues that the district court was correct in finding S3's statements reliable because they were corroborated by S1 and S2.  We are unpersuaded.  While it is true each anonymous witness implicated Cripps in a drug distribution network, as to drug *quantities*, the corroboration ends there.  The government's contention depends exclusively on a comparison to an unpublished opinion, *United States v. Pacheco*, No. 22-7062, 2024 WL 561927 (10th Cir. Feb. 13,

8

2024).  There, the district court relied on coconspirator statements to increase the defendant's drug quantity at sentencing.  The statements demonstrated that each coconspirator knew specific details about the defendant's purchaser, typical payment method, and typical drug quantities.  *Id.* at *3 ("[T]he statements . . . all suggested [d]efendant purchased methamphetamine from suppliers in at least one-pound quantities and redistributed it to buyers in one-ounce or greater amounts.").  The court found the statements reliable because they were consistent and thus corroborated one another.

The *Pacheco* court also benefited from external corroborating evidence. Government wiretap evidence substantiated statements about supplier identities and physical evidence recovered from the defendant corroborated the statements about drug quantities.  *Id.* ("Defendant's possession of multiple bags containing one ounce or more of methamphetamine is consistent with . . . statements that [d]efendant redistributed methamphetamine in at least one-ounce quantities.").  Based on the consistency between the coconspirators' statements and the corroborating evidence, we held that the district court did not clearly err in relying on the statements to enhance the defendant's drug quantity at sentencing.

This case is different.  Unlike *Pacheco* where the coconspirator statements identified key actors and mentioned specific quantities with consistency, S3's comments are anomalous compared to the other two sources.  The only place where S3's statements find any support is in S2's interview from December 6, 2021.  When asked about the source of Cripps' methamphetamine, S2 said that Cripps had

"mentioned going to Oklahoma City to pick up 'kilo's.'" Supp. R. Vol. I at 14. Though this statement is referencing a quantity of methamphetamine closer to what S3 described, it presents two problems for the government. First, using one uncorroborated statement to support another raises serious bootstrapping concerns. Second, S2's comment remains discrepant with S3's. S2's comment seems to indicate that Cripps himself would make the alleged trip, not S3. Failing to demonstrate a similar consistency, the government's invocation of *Pacheco* is unpersuasive.

And the government in *Pacheco* presented wiretap evidence and physical evidence recovered from the defendant's arrests to support the coconspirator statements. The government here provided nothing additional. The case against Cripps lacked the type of support the *Pacheco* court found compelling. Any apparent corroboration among the sources' statements went to the fact that Cripps dealt drugs generally, not the specific quantities used to enhance his sentence. Without more, it was error for the district court to rely on S3's statements to enhance Cripps' drug quantity at sentencing.

Finally, Cripps argues that the district court incorrectly shifted the burden of proof on the reliability issue to the defense. In support, Cripps cites one statement by the district judge at sentencing: "there has been no evidence presented to deem the information provided by S2 and S3 as unreliable." R. at 152. Because S3's statements were uncorroborated, there is no need to address whether the district court's stray comment constituted improper burden shifting. In any event, the district

10

court also explicitly laid the burden at the government's feet when it said, "[i]t is your burden, [prosecutor], would you like to make any argument?" *Id.* at 146. Based on the sentencing hearing transcript, there is no support for Cripps' claim that the district judge shifted the burden of proof to the defense.

### D.    Scope of Remand

Typically, trial courts resentence defendants de novo upon remand. *United States v. Campbell*, 372 F.3d 1179, 1183 (10th Cir. 2004). "[D]e novo resentencing permits the receipt of any relevant evidence the court could have heard at the first sentencing hearing." *United States v. Ortiz*, 25 F.3d 934, 935 (10th Cir. 1994). This means "the court on remand has the discretion to entertain evidence that could have been presented at the original sentencing even on issues that were not the specific subject of the remand." *United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996). The defendant is afforded the same procedural rights on resentencing as on the initial sentencing and may, for example, raise new objections for good cause shown. *United States v. Smith*, 930 F.2d 1450, 1456 (10th Cir. 1991); *Moore*, 83 F.3d at 1235.

But appellate courts have discretion to limit resentencing to the current record. 18 U.S.C. § 3742(f)(1). Cripps asks us to limit our remand solely to the original record before the district court.

Three considerations guide us to close the record if they are present: (1) the government bore the burden of proof; (2) the defendant alerted the government to the deficiency in its evidence; and (3) the government took no action to cure the defects in its proof. *United States v. Thomas*, 749 F.3d 1302, 1315–16 (10th Cir. 2014). We

11

have assigned differing levels of weight to the third factor,[2] but generally, if all three factors are present, we "decline to give [the government] a second bite at the apple." *Campbell*, 372 F.3d at 1183.

On this record, we decline to limit resentencing to the existing record. The government bore the burden of proving Cripps' drug quantity by a preponderance of the evidence. It is true that by objecting to the reliability of S3's statements, Cripps put the government on notice as to the deficiencies in its proof. When this case diverges from our limited remand cases is in the government's reaction.[3] In response to Cripps' objection, the government attempted to cure the alleged defects. The government called Agent Tucker as a witness in an effort to show that the sources' statements were reliable and corroborated. Though this attempt ultimately failed, an attempt it was. We credit the government's efforts to meet Cripps' objection, and we are persuaded to keep the record open on remand.

Our discretion to close the record should be exercised only when the government lets the first pitch go by without taking a swing. A strike looking forfeits

---

[2] *Compare Campbell*, 372 F.3d at 1183 (limiting the record on remand when the defendant "alerted the government to the deficiency in its evidence, [but] the government did not seek to cure the deficiency"), *with United States v. Keifer*, 198 F.3d 798 (10th Cir. 1999) (remanding for de novo resentencing even though the government did not respond to the defendant's objection).

[3] *See United States v. Forsythe*, 437 F.3d 960 (10th Cir. 2005) (declining a request for de novo resentencing, concluding that the government should not have a second opportunity to make the record it failed to make earlier); *Thomas*, 749 F.3d at 1315–16 (limiting the record on remand where the government failed to cure deficiencies in the defendant's criminal-history score calculation).

another attempt. A swing and a miss, however, preserves the issue and warrants a second attempt. The government did not take "no action" in response to Cripps' objections, so we see no reason to depart from the typical rule here. *Cf. Thomas*, 749 F.3d at 1316 ("[W]e too decline to give the government a second opportunity to make the record that it failed to make the first time. Thus, on remand, the district court must recalculate the criminal-history score based on the existing record.").

We decline to exercise our discretion to limit the record upon remand. The district court may resentence Cripps de novo.

## III.   Conclusion

We vacate the district court's judgment and remand for resentencing consistent with this opinion.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge